918 So.2d 988 (2006)
PALM BEACH POLO, INC., Appellant,
v.
The VILLAGE OF WELLINGTON, Appellee.
No. 4D04-2839.
District Court of Appeal of Florida, Fourth District.
January 18, 2006.
*990 Larry A. Zink of Zink, Zink & Zink Co., L.P.A., for appellant.
Claudio Riedi and Anthony J. O'Donnel, Jr. of Lehtinen, Vargas & Riedi, P.A., Miami, for appellee.

On Motion for Clarification
WARNER, J.
We grant appellee's motion for clarification, withdraw our previously issued opinion and substitute the following in its place.
The Village of Wellington filed a declaratory action and also requested injunctive relief against appellant Palm Beach Polo, Inc. in connection with the 1972 Wellington Planned Unit Development. Pursuant to the PUD, Wellington sought to have Polo restore, enhance, and preserve an area known as Big Blue Reserve. Polo counterclaimed for inverse condemnation and violation of the Bert J. Harris, Jr., Private Property Rights Protection Act, claiming that the "Conservation" designation of Big Blue in Wellington's Code, as well as Wellington's insistence that Polo "preserve" and "restore" the area, constituted an "as applied" taking. Because the PUD agreement with Polo's predecessor-in-title contemplated the preservation of Big Blue and made specific provisions therefore, and because the developmental densities were transferred from the area in exchange for higher densities elsewhere, we conclude that no taking has occurred. We affirm the trial court's final judgment.
Big Blue Reserve or Forest is an undeveloped tract of land, approximately ninety-two acres in size, in the Village of Wellington. It contains wetlands and many old-growth cypress trees, some more than 300 years old. Big Blue is the focus of this appeal.
In 1971 most of the Village of Wellington was owned by AlphaBeta, Inc. and Breakwater Housing Corp. Desiring to develop Wellington, they entered into a Planned Unit Development with Palm Beach County. The result became the Wellington PUD.
A Planned Unit Development is a zoning device used to permit flexibility in design and use of property. See Frankland v. City of Lake Oswego, 267 Or. 452, 517 P.2d 1042 (1973). It is an agreement between the land owner and the zoning authority, and the terms of development are negotiated between the parties in accordance with the conditions set forth in the governing ordinances. A PUD plan, in compliance with zoning regulations, is submitted to the county for approval.
In 1972, the Zoning Resolution for Palm Beach County provided that, with respect to the Wellington PUD, "The intent and purpose of this section is to provide an alternative means of land development and to provide design latitude for the site planner." That year, the county approved the Wellington PUD submitted by AlphaBeta and Breakwater. It covered the development plan for 7400 acres. At the hearing approving the plan, several conditions were placed upon the approval. These included:
Developer proposes an overall average of 2 dwelling units per acre with public open space of over 25%. Development expected to take at least until year 2000; *991 Will enhance and preserve big blue areas and pine tree forests. Will develop a ring of water around it for protection. Will increase water level 1 foot (back to its original condition) and animal life can be restored to its original condition.
Will preserve natural vegetation.
A planned community of open spaces, bicycle paths, golf course and recreation areas, with restoration and preservation of big blue pristine forest areas.
The notes of the commission meeting reflect that as a reason for approval, the property, as zoned, could be developed with single-family dwellings with a density of four units per acre. However, the developer committed to an overall density of two units per acre, which was made one of the conditions of the plan. Big Blue was given an OS-R designation, meaning Open Space-Reserve, in an Agricultural/Residential zoning district.
A year later, in connection with an application for a binding letter of interpretation, the developer submitted an informational package to the State Department of Administration. In that package the developer stated the following regarding Big Blue:
This 120-acre pristine forest containing some yet unnamed fern specimens, has been explored recently by a team of hardy souls who have ventured into this area to determine how best this untouched area can be preserved in its natural state.
There have been claims of ferns 15 feet and higher as well as cypress trees reaching 85 to 100 feet in height flourishing in this wilderness area, along with abundant animal life. There is a definite contrast between the deafing [sic] quietness within the forest and the pure shrill sounds of literally dozens of species of birds.
You can now walk into the Big Blue, very carefully, with proper guides; no vehicles will be allowed on the path. The Big Blue is a "must" evidencing an appreciation of the conservation, preservation and environmental attitude that is typical of the Wellington project.
In addition, the application by the Acme Improvement District for surface water management for the Wellington area noted that the environmental considerations upon most of the Wellington PUD property were not significant because it was abandoned agricultural land, except for Big Blue. In its application the District noted that Big Blue "will be preserved in its existing state...."
In 1987 the surface water permit plan was modified with a particular emphasis on the Big Blue. This was done based upon application of the Landmark Land Company of Florida, Inc. The South Florida Water Management analysis refers to the proposed modification as completing the berm around Big Blue. The review stated, "The restoration of the Big Blue is dependent upon the perimeter berm being completed and constant inundation being maintained.... Constant inundation will kill most of the Brazillian Pepper [exotic vegetation present] and prevent further invasion."
The county adopted its Comprehensive Plan in 1988. The next year, the developer asked for another modification of the Wellington PUD. In the ordinance approving the modification, the county made it conditional upon the amending of the tabular data of the plan to reflect the "acreage of the OS-R natural reserve known as Big Blue reserve."
Landmark experienced financial difficulties and went into bankruptcy. In 1993, Palm Beach Polo's sister company purchased Landmark's interest in Wellington, including the Big Blue Reserve at a bankruptcy *992 auction. Prior to the purchase, it received and reviewed a five volume Due Diligence Report regarding the entire property. Prepared by the bankruptcy trustee, the report conceded that it had not exhausted all information available about the property, but it included the Wellington Master Plan which designated the Big Blue Reserve as OS-R. The Surface Water Management Permits were also referenced in the report. However, no one on behalf of Polo contacted Palm Beach County Planning and Zoning Department or the county records to check the local land use regulations and other resolutions or permits. The sister company purchased the property essentially "as is." It then transferred the property to Polo in November 1993.
Prior to trial, Wellington and Polo submitted a joint pretrial stipulation, in which they stated:
As of 1993, the zoning designation of the land in the Wellington PUD as a whole, which included Big Blue, was and is ARSE (PUD), which stands for Agricultural/Residential subject to a Special Exception for a Planned Unit Development. The Wellington PUD Master Plan in 1993, and still today, designated Big Blue as "OS-R," which means Open Space-Recreation. Big Blue has remained undeveloped until today.
Wellington became incorporated after the purchase by Polo. In 1999, it adopted its own comprehensive plan which essentially followed the Palm Beach County Comprehensive Plan. The 1999 Wellington plan included a "conservation" designation for Big Blue. According to its officials, this was merely a restatement of the property's longstanding OS-R designation under the PUD. It imposed no duties that were not in existence prior to its designation as conservation.
Polo protested the conservation designation in the plan, making a claim under the Bert J. Harris Act, and Wellington responded with a letter reciting its position that no change would be made to the comprehensive plan designation for Big Blue. Polo then invited the council members to visit the site. At a subsequent meeting, the Polo president offered to give Wellington fifty acres of the site, but based on the council members' responses at the meeting, he believed that the proposed plan had no chance of approval.
Wellington then filed its own suit for declaratory judgment seeking to enforce the requirements of the 1972 PUD regarding Big Blue for flooding of the property and removal of exotic vegetation. Polo answered, contending that it had no legal obligation to preserve Big Blue. It asserted that the preservation boundaries were not legally described and that the restorative measures were too general in the original 1972 PUD to be enforced, nor were they properly implemented prior to Polo's acquisition in 1993. It counterclaimed for inverse condemnation, contending that the requirements for preserving Big Blue constituted an unlawful taking and a violation of the Bert J. Harris Act.
After a lengthy trial with voluminous exhibits, the court found in favor of Wellington. Specifically, the court determined, in part:
4. Florida law has no requirement that zoning regulations be recorded in the chain of title to be enforceable against a property owner. An owner is legally obligated to examine the public records of the zoning authority and is on constructive notice of the ordinances, resolutions, and filed plans and restrictions governing a parcel of property. Metropolitan Dade County v. Fontainebleau Gas & Wash, 570 So.2d 1006 (Fla. 3DCA 1990); Town of Lauderdale-by-the-Sea *993 v. Meretsky, 773 So.2d 1245 (Fla. 4DCA 2000). In the present case, all of the land regulations, restrictions and obligations were set forth or referenced in the Due Diligence Report provided to and reviewed by Polo prior to its acquisition of the property in 1993. As Polo presented no contrary or competing case law this Court finds that Polo was obligated to comply with the zoning regulations in existence as the time of the purchase.
5. This court further finds that the conditions preserving Big Blue as a natural open space under the PUD Master Plan are enforceable zoning regulations, as interpreted by Wellington's zoning director, to be followed by Polo. As required by law, this Court defers to the interpretation given to the regulations by the agency responsible for its administration. See Las Olas Tower Co. v. City of Ft. Lauderdale, 742 So.2d 308 (Fla. 4DCA 1999); Department of Environmental Regulation v. Goldring, 477 So.2d 532 (Fla.1985).
6. Wellington presented testimony that in 1993, the PUD Master Plan included conditions and restrictions applicable to Big Blue that required the purchaser to "preserve and enhance" Big Blue; "increase the water level 1 foot" within Big Blue; and maintain Big Blue as an "open space" natural reserve with no residential units assigned to it and no other development or alteration permitted. The terms "preserve" and "open space" are specifically defined in Wellington's Uniform Land Development Code. Further, Wellington presented the testimony of its zoning director, Paul Schofield, that he interpreted the terms "preserve" and "open space" in accordance with their code definitions and plain dictionary meanings. He also interpreted the terms "enhance" and to "increase the water level 1 foot" in accordance with their plain dictionary meanings as permitted by the Uniform Land Development Code. Polo offered no alternative interpretations or any authority that allowed some other agency official to render an interpretation. This Court concludes that Polo, as the purchaser of the property was required to comply with the zoning regulations.
7. The uncontradicted testimony at trial clearly established that the PUD Master Plan restrictions on the use of Big Blue existed many years prior to Polo's acquisition and were compensated for by allocation of any development rights of Big Blue to other parcels within the boundaries of the Wellington PUD tract. As a result, Polo failed to establish any reasonable investment-backed expectations with respect to development of the Big Blue property. Accordingly, Polo's alleged inability to develop this PUD parcel does not constitute an unconstitutional taking or inverse condemnation. City of Riviera Beach v. Shillingburg, 659 So.2d 1174 (Fla. 4DCA 1995); Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978).
8. The uncontradicted evidence established that the PUD Master Plan allowed for a total of 14,625 residential units within its boundaries at density of approximately two dwelling units per acre. Said units were allocated to specific parcels to create a plan of development of different parcels containing a variety of different densities and uses. This planned allocation resulted in some parcels having a higher density than two dwelling units per acre, some having a lower density and some, such as the Big Blue Parcel, having no density at all. Each parcel has a specific number of residential units assigned on the overall *994 plan, but the total residential density of the entire PUD tract was required to be below two units per acre in accordance with the property's LR-2 designation under Palm Beach County's comprehensive plan. The average two units per acre residential density given Big Blue under the comprehensive plan's LR-2 designation was completely transferred out of Big Blue under the PUD Master Plan and allocated to other parcels in the development so that the owner received compensating development rights for its agreement to preserve Big Blue as a natural, open space reserve.
As to Polo's takings claims, the court determined that Polo had not presented a meaningful application for an amendment to the comprehensive plan such that the issue was ripe for adjudication. See Taylor v. City of Riviera Beach, 801 So.2d 259 (Fla. 4th DCA 2001); Tinnerman v. Palm Beach County, 641 So.2d 523 (Fla. 4th DCA 1994).
In reference to Polo's claim that Big Blue was not legally described in the 1972 plan, the court found:
12. As an affirmative defense, Polo asserts that the preservation areas were not legally described in the original 1972 PUD resolution. The evidence showed that the PUD Master Plan, golf course site plans and residential subdivision plats adopted to implement the Wellington PUD after its initial conceptual approval in 1972 progressively refined the size and boundaries of Big Blue. Resolution 87-522 adopted in 1977 expressly set forth the requirement that the PUD Master Plan be revised to reflect the PUD's preservation areas and that the boundaries of preservation areas be "platted concurrent with adjacent residential tracts". See Resolution No. R-87-522; Due Diligence Report; Exhibit E; Plf. EX 51. The evidence clearly established that the boundaries have been refined over the years as the property has developed. Accordingly, this defense is without merit.
With respect to Polo's claim that the preservation requirements had not been enforced, the court dismissed this claim as follows:
13. Polo further asserted as a defense that the PUD zoning requirements were not properly implemented or enforced prior to Polo's acquisition in 1993. Florida law provides that a local government is authorized to enforce its regulations even if it has not previously done so by either mistake or delay. Metropolitan Dade County v. Fontainebleau Gas & Wash, supra; Town of Lauderdale-by-the-Sea v. Meretsky, supra. Local governments have the right to enforce duly adopted regulations. Hence, this affirmative defense is contrary to established Florida law.
As relief, the court required Polo to comply with the PUD Master Plan's restrictions by preserving Big Blue and protecting it from alteration and development activities, to enhance it by removing exotic vegetation, and to preserve and enhance it by increasing the property's water levels by one foot above existing levels. Polo appeals this judgment.
We dispose first of Polo's claim that it is entitled to compensation under the Bert J. Harris Act, section 70.001, Florida Statutes. That statute creates a cause of action where a law, regulation, or ordinance, as applied inordinately burdens, restricts, or limits use of property without amounting to a taking. Section 70.001(2) provides:
When a specific action of a governmental entity has inordinately burdened an existing use of real property or a vested right to a specific use of real property, *995 the property owner of that real property is entitled to relief, which may include compensation for the actual loss to the fair market value....
Section 70.001(3)(e) provides, in part:
The terms "inordinate burden" or "inordinately burdened" mean that an action of one or more governmental entities has directly restricted or limited the use of real property such that the property owner is permanently unable to attain the reasonable, investment-backed expectation for the existing use of the real property or a vested right to a specific use of the real property with respect to the real property as a whole, or that the property owner is left with existing or vested uses that are unreasonable such that the property owner bears permanently a disproportionate share of a burden imposed for the good of the public, which in fairness should be borne by the public at large.
The statute defines "existing use" in section 70.001(3)(b) as follows:
The term "existing use" means an actual, present use or activity on the real property, including periods of inactivity which are normally associated with, or are incidental to, the nature or type of use or activity or such reasonably foreseeable, nonspeculative land uses which are suitable for the subject real property and compatible with adjacent land uses and which have created an existing fair market value in the property greater than the fair market value of the actual, present use or activity on the real property.
We think it is fairly obvious from the abundant history of Big Blue that there was no "reasonable, investment-backed expectation" for an existing use of Big Blue at all. From 1972 forward it was designated as a natural reserve and extraordinary efforts were made to preserve this important pristine forest. As part of the PUD, any development density available to the acreage in Big Blue was transferred to other property in the Wellington PUD. At the time Polo purchased the Wellington property, Big Blue was designated as a nature reserve. Wellington's redesignation of it as a "conservation area" in its comprehensive plan changed nothing regarding the property. Polo failed to establish that at any time it was entitled to build on the property. In sum, Polo's claim that a violation of the Bert J. Harris Act occurred is frivolous.
Polo next argues that the 1972 Wellington PUD Master Plan is unconstitutional as applied to the Big Blue property because it is overly broad and vague, lacking definition of critical "technical" terms. It includes in those "technical" terms the words "big blue areas," "preserve," "restoration," "enhance," and the like. Even if we were to agree that these are "technical" terms, which we do not, both Polo's predecessors-in-title, as well as the regulating agencies, have given specific meanings to them.
"Generally, a reviewing court should defer to the interpretation given a statute or ordinance by the agency responsible for its administration. Of course, that deference is not absolute, and when the agency's construction of a statute amounts to an unreasonable interpretation, or is clearly erroneous, it cannot stand." Las Olas Tower Co. v. City of Fort Lauderdale, 742 So.2d 308, 312 (Fla. 4th DCA 1999) (citations omitted) (holding that interpretation of word in city code by agency responsible for its administration was a reasonable interpretation and therefore lower court applied correct law in determining that agency did not depart from essential requirements of law). Here, the Director of the Department of Zoning testified *996 at length to the interpretation of these terms. Some terms were defined in the zoning code, and some required the ordinary dictionary definition of the term. In its final judgment, the trial court also noted that Polo offered no alternative interpretations for the terms.
At the time Polo acquired the property, the Palm Beach County Comprehensive Plan, its ordinances, and resolutions controlled the property. The Comprehensive Plan contained an entire element on conservation which included policies with respect to the preservation of natural resources. The plan also defined "preservation" as "the perpetual maintenance of areas in their original state." Subsequently, the Wellington Code also provided definitions, and stated that these definitions "shall be liberally construed in order that the true intent and meaning of the Board of County Commissioners as established in the Comprehensive Plan may be fully carried out." The Code defines the terms "preserve" as follows:
Preserve or preserve area means that portion of native vegetation which is required to be set aside from development or other alteration activities, protected from the removal of any native plant species, managed to maintain viability for wildlife habitat, and maintained free of non-native plant species.
William Boose, the director of the Palm Beach County Planning and Zoning Department in 1972, testified that at the time he approved the PUD plan, he understood the term "preserve," as it related to Big Blue, as "the long term preservation of the area in its natural state without man-made alteration except for exotic vegetation removal, which would have been recommended." Further, Guerry Stribling, the president of Breakwater Housing Co., which was one of the original applicants for the 1972 PUD, testified that it was his intention to preserve Big Blue in its natural state.
The trial court was correct in deferring to the agency's interpretation of its zoning code. The entire history of Big Blue and its regulation by the county and then the Village of Wellington shows that the meanings of the terms were well understood by all parties. Not only were they understood generally, but substantial evidence shows that specific requirements were also understood. The South Florida Water Management District Surface Water Management Permits are quite specific in the berming of Big Blue to inundate the property and also to remove exotic vegetation.
It is particularly appropriate to rely upon the interpretation of the zoning director, which was confirmed by both parties who negotiated the terms of the PUD, as to this conditional use designation. As noted in Westminster Homes, Inc. v. Town of Cary Zoning Board of Adjustment, 354 N.C. 298, 554 S.E.2d 634, 638 (2001):
[C]onditional use zoning occurs when a governmental body, without committing its own authority, secures a given property owner's agreement to limit the use of his property to a particular use or to subject his tract to certain restrictions as a precondition to any rezoning.... [T]he only use which can be made of the land which is conditionally rezoned is that which is specified in the conditional use permit.
[Citations omitted]. [Emphasis supplied].
In Westminster, petitioners challenged a conditional permit which limited their ability to install fences on their property. The court upheld the permit's restrictions and held that:
The permit is a result of a compromise bargain, an agreement for higher density development by Westminster in exchange *997 for additional privacy protection for Harmony Hill.... Harmony Hill residents would be left with substantially less than the privacy for which they bargained if gates were permitted under the permit, after giving the full benefit of greater development to Westminster and petitioners.
Id. at 641.
Similarly, in this case, the original developers of the PUD property, AlphaBeta, Inc. and Breakwater Housing Co., included in their 1972 PUD application the specific conditions regarding Big Blue that were ultimately adopted and incorporated into the 1972 PUD plan. Stribling testified that in working up the PUD application he had several meetings with the Palm Beach County Planning and Zoning Board in which there was an exchange of information and ideas. Breakwater's and AlphaBeta's intentions were to preserve Big Blue and restore it to its original state. In return, the county permitted them to have great flexibility in their development plans, and the trial court found that the owner received compensating development rights for the preservation of Big Blue. It would be contrary to the original agreements to allow Polo to now avoid the obligations that its predecessors in title consented to, and which it had actual knowledge of through the extensive history in the public documents regarding the Wellington PUD.
Finally, we need not spend further time or effort in analyzing a takings claim. Although the Big Blue property will be flooded and thus unusable for development, that is precisely the condition of the property that Polo's predecessors agreed to in exchange for developing other property with higher densities. In City of Riviera Beach v. Shillingburg, 659 So.2d 1174 (Fla. 4th DCA 1995), a regulatory takings case, this court explained that the denial of use of some of a landowner's property does not itself constitute an unlawful taking, because the property must be considered in its entirety. In determining if a portion of the land should be considered as a whole or treated separately, the factors to be considered are whether the land is contiguous and whether there is unity of ownership. Id. at 1183. Whether there is a taking of Big Blue property requires a consideration of what occurred when the PUD was originally developed on the 7400 acres of Wellington in 1972. It was at that time that the owners bargained for development of vast sections at higher densities in return for preservation of Big Blue. This was an agreed restriction, compensated by the transfer of development rights to other property. No taking has occurred.
The trial court's judgment was thorough and correct. We affirm it in its entirety.
KLEIN and TAYLOR, JJ., concur.