DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**OCEAN CONCRETE, INC.** and **GEORGE MAIB,**
Appellants,

v.

**INDIAN RIVER COUNTY, BOARD OF COUNTY COMMISSIONERS,**
Appellee.

No. 4D16-3210

[March 14, 2018]

Appeal from the Circuit Court for the Nineteenth Judicial Circuit, Indian River County; Cynthia L. Cox, Judge; L.T. Case No. 312007CA011589.

Stephen B. Burch, Geoffrey D. Smith and Susan C. Smith of Smith & Associates, Melbourne, for appellants.

Paul R. Berg of Vocelle & Berg, L.L.P., and Dylan Reingold, Vero Beach, for appellee.

DAMOORGIAN, J.

Appellants, Ocean Concrete, Inc. and its principal, George Maib, appeal a final judgment entered in favor of Indian River County (the "County") in Appellants' property rights related lawsuit against the County. The substance of this appeal is comprised of the following issues: (1) whether the court erred in its conclusion that Appellants failed to prove entitlement to relief under the Bert J. Harris, Jr. Property Rights Protection Act;[1] (2) whether the court considered irrelevant factors in reaching its conclusion that the County did not effectuate a regulatory taking of Appellants' property interests; and (3) whether the court made certain evidentiary rulings which require a retrial on Appellants' procedural due process violation claim. We affirm the second and third issues without further comment. As for the first issue, we conclude that the trial court reversibly erred and remand for further proceedings.

[1] The Bert J. Harris, Jr. Property Rights Protection Act is codified in section 70.001 of the Florida Statutes (2008). For purposes of this opinion, it will be referenced to as the "Harris Act."

## Factual Background

In 2002, Mr. Maib began formulating a plan to develop and run a concrete batch plant in the Treasure Coast area. A key element of the plan was acquiring a parcel of land with railway access which would allow him to keep costs down by importing raw material in bulk via freight train. With this is mind, Mr. Maib scouted the subject land, an 8.5+ acre parcel located near the city limits of the City of Sebastian in Indian River County. The parcel was zoned light industrial ("IL") under the County's zoning code which, at that time, provided that concrete batch plans were an allowed use in IL zoned districts. The lands surrounding the parcel, however, were primarily zoned for residential and limited commercial use. An aerial view of the parcel showed that the surrounding land was undeveloped.

In 2004, Mr. Maib entered into a contract to purchase the property for $575,000 with a 120 day inspection period. Mr. Maib retained an engineer to ascertain the feasibility of developing a concrete batch plant on the property. The engineer testified that after reviewing all relevant documents, he had no concerns about the feasibility of the project from either an engineering or development standpoint. The engineer drafted a conceptual, pre-application site plan for County review. Mr. Maib and his engineer attended a meeting with County planning staff where the staff represented that a concrete batch plant was a permitted use as a matter of right under the zoning code and provided feedback about the project. Mr. Maib and his engineer left the meeting believing that the development of the plant was feasible and that none of the feedback from the planning staff would prohibit the development. Based on the foregoing, Mr. Maib purchased the property.

In 2005, Mr. Maib filed a site plan application for review by the County's Technical Review Committee ("TRC"). The TRC responded to the application in writing by listing out several "discrepancies" which needed to be addressed before moving forward with the application. The TRC's discrepancy letter also noted that a concrete batch plant was a permissible use of the property as a matter of right, the discrepancies were not significant, and that no second TRC meeting would be required for reconsideration of the application. Mr. Maib then underwent efforts to remedy those discrepancies and also began improving the property. Specifically, Mr. Maib obtained permits to install storm water systems, installed wells, cleared and graded the property, planted a landscape buffer, and began to install a rail spur. He also formed Ocean Concrete, Inc., began developing a detailed business plan, and sought out financing for the project. During this process, Mr. Maib realized that it was going to take an additional two years to meet all of the technical requirements for

2

approval of the site plan. Therefore, he let the site plan application expire in November of 2006 with the intent of filing a new site plan application and requesting a one year extension. Mr. Maib filed a new site plan application on December 6, 2006.

Thereafter, the TRC issued another discrepancy letter identifying the discrepancies in the site plan application which Mr. Maib was required to address, in writing, before proceeding. This discrepancy letter again noted that the "site is zoned IL, Light Industrial. Concrete batch plants are a use permitted by right in the IL district" and that "the discrepancies do not appear to be significant, therefore, no second TRC meeting will be required for reconsideration of the proposal." Mr. Maib continued to address the discrepancies but, as he did, the project began garnering public and governmental opposition.

The nearby City of Sebastian issued a resolution imploring the County to deny approval for the proposed Ocean Concrete project. Around this same time, a group of citizens formed an organization called "Stop Ocean Concrete." The leader of this organization appeared at a Board of County Commissioners ("BCC") meeting and asked the BCC to amend the zoning code to eliminate heavy process uses from the IL zoning district. The BCC then directed the planning staff to analyze the issue and shortly thereafter, the County's planning director issued a memo recommending that the BCC change the zoning code to "restrict industrial uses such as concrete plants and paper mills that process large quantities of materials, produce dust and noise, and have outdoor activities to the IG (General Industrial) district." At its next meeting, the BCC voted to have the staff change the zoning code as recommended.

Following the BCC's vote, County staff began the process of amending the zoning code. Inevitably, the impact of any changes on Mr. Maib's existing site plan application was a point of heavy discussion. A May 8, 2007 memo written by a senior planner noted:

> The Ocean Concrete project is opposed by many residents of Sebastian and the north county, as evidenced by petitions and letters of objection submitted to staff. That project's application will expire on December 6, 2007 if it is not approved by that date. Because that site plan application is active, changes to the IL district regulations will not affect that application unless special effective date provisions are added to the amendment ordinance. At this time, the County Attorney has not issued an opinion as to whether or not the county can legally apply the proposed amendment to an

3

existing application. The proposed changes will certainly affect applications to develop IL zoned sites submitted after the changes are adopted.

During this time and unbeknownst to Mr. Maib, the county attorney and the planning director were engaged in a discussion about whether the proposed change to the zoning code would apply to the Ocean Concrete project. After the attorney opined that the change would apply to the project, the Planning and Zoning Commission voted to recommend approval of the changes to the zoning code. Thereafter, the BCC unanimously voted to adopt the amendments to the zoning code "void of any exception or merit for grandfathering of vested rights."

Appellants filed a declaratory action in the circuit court seeking clarification of their rights to proceed under the site plan application. They also filed a request for a one year extension with the County on their pending application. The County denied the extension and based on the expiration of the application, denied Appellants' application. Appellants administratively appealed and amended their declaratory action complaint to add a cause of action for violation of the Harris Act. Appellants' administrative appeals were denied, causing Appellants to file a petition for writ of certiorari with the circuit court sitting in an appellate capacity. The circuit court determined that the County must either grant the extension, state a valid reason for denial, or deny the site plan on its merits. The BCC voted to grant Appellants a one year extension under the "old code" provisions.

Following the reinstatement of Appellants' application, the County staff approved the site plan application under the old zoning code conditioned on a finding by the Community Planning Director of a vested right of development under the old code. The Community Planning Director, found that there was no vested right and denied Appellants' site plan application under the new code. Mr. Maib appealed the denial to the Planning and Zoning Commission but, while his appeal was pending, lost the property to foreclosure. The Planning and Zoning Commission then dismissed Appellants' appeal as moot. At this point, Appellants added a cause of action for a regulatory taking and violation of their due process rights to the declaratory action.

The matter proceeded to a simultaneous bench/jury trial with the court considering Appellants' regulatory taking, Harris Act, and substantive due process claims and a jury considering the procedural due process claim. At trial, Appellants presented expert testimony from a real property appraiser and construction business valuators. Appellant's experts valued

the property with a completed concrete batch plant at $10 million.  In turn, the County presented its own experts who opined that market value of the property before the zoning amendment was $1 million and that the change in the zoning amendment only reduced the property's value by 3.5%.  The County also presented evidence to support its contention that operating a concrete batch plant on the property was not economically feasible.

At the conclusion of the trial, the jury found that the County did not violate Appellants' procedural due process rights.  The trial court found that Appellants did not prove that the County effectuated a regulatory taking, violated the Harris Act, or violated Appellants' substantive due process rights.  Holding that the court erred in finding no violation of the Harris Act, we reverse and remand.

### Analysis

The Harris Act was enacted by the Florida Legislature in 1995 as a mechanism to protect and compensate any landowner whose property is affected by government action not rising to the level of a taking. §°70.001(1), Fla. Stat. (1995).  To prevail under the Harris Act, the property owner must prove that "a specific action of a governmental entity has inordinately burdened an existing use of real property or a vested right to a specific use of real property." § 70.001(2), Fla. Stat. (2008).  Accordingly, when a claim under the Harris Act is presented for judicial review, the court must first consider whether a claimed "existing use of the real property" or a claimed "vested right to a specific use of the real property" actually existed.  If it finds either, it must next determine whether the government action inordinately burdened the property. § 70.001(6)(a), Fla. Stat.  If the court also finds that that there was an inordinate burden, then it must impanel a jury to determine the total amount of compensation to the property owner for the loss caused by the inordinate burden to the property.  § 70.001(6)(b), Fla. Stat.  The party seeking relief under the Harris Act bears the burden of proof.  *See Town of Ponce Inlet v. Pacetta, LLC,* 120 So. 3d 27, 29 (Fla. 5th DCA 2013).

In this case, the court found Appellants did not establish that the use of the property as a concrete batch plant was an existing use. Alternatively, it found that the County's actions did not inordinately burden the property.  We review these determinations de novo.  *City of Jacksonville v. Coffield,* 18 So. 3d 589, 594 (Fla. 1st DCA 2009).

a) Existing Use

The term "existing use" is defined by the Harris Act as:

> [1] an actual, present use or activity on the real property, including periods of inactivity which are normally associated with, or are incidental to, the nature or type of use or activity or
>
> [2] such reasonably foreseeable, nonspeculative land uses which are suitable for the subject real property and compatible with adjacent land uses and which have created an existing fair market value in the property greater than the fair market value of the actual, present use or activity on the real property.

§ 70.001(3)(b), Fla. Stat. (2008) (spacing and numbers added).

Because a concrete batch plant did not exist on the property, the court applied the second part of the "existing use" definition. Neither of the parties contend that this was improper. With this parameter in mind, the court then found that because a concrete batch plant was a permitted use as a matter of right under the County's old zoning code, it was a reasonably foreseeable use of Appellants' property. However, the court went on to find that a concrete batch plant was not a non-speculative use. This finding was rooted in economics, and more particularly, the court's determination that the project was not financially viable. The court also concluded that the use was not compatible with adjacent lands. For the reasons set forth below, we hold that the court's non-speculative use and compatibility analysis was legally incorrect.

### i) Reasonably Foreseeable, Nonspeculative Use

Applying a plain language reading analysis to the statute leads us to conclude that the term relates to whether the actual **land use** is nonspeculative without concern to economics. The phrase "nonspeculative" appears in the definition of "existing use" as follows:

> "reasonably foreseeable, nonspeculative land uses . . . ."

§ 70.001(3)(b), Fla. Stat. (2008).

The noun in the above phrase is "land uses." The terms "reasonably foreseeable" and "nonspeculative" are adjectives modifying the noun "land use." Thus, based on the grammatical structure, the key inquiry for the court is whether a concrete batch plant, as a **land use**, was foreseeable and nonspeculative at the time the County amended its zoning code.

6

Notably, at least one appellate judge has arrived at the same conclusion. In his dissent in *City of Jacksonville v. Smith*, 159 So. 3d 888, 913 (Fla. 1st DCA 2015),[2] Judge Makar wrote:

> The point of subsection 2 [within the existing use definition] is not to preclude "speculation" in the financial sense; if that were the case, no privately-held real property would qualify because land ownership always involves an element of financial risk. Instead [the definition] is designed to limit possible future land uses to only those that are within reason, i.e., "reasonably foreseeable" and "nonspeculative." Stated differently, future uses that are merely theoretical or hypothetical do not qualify; they are speculative in the sense of these two terms.

The plain language of the Harris Act is clear: the term "nonspeculative" refers to the land use and, therefore, a "nonspeculative use" analysis really only comes into play when a party is arguing that it may have been able to use its land in the future for a purpose not expressly provided for by the zoning code at the time of the government action. Conversely, when the use was expressly provided for, as it was here, there is no need for a speculation analysis. Accordingly, based on the plain language of the Act, the court erred in concluding that a concrete batch plant was not a nonspeculative land use when making its "existing use" determination.[3]

---

[2] Our citation to the dissent in *Smith* is in no way meant to distinguish the majority holding as it not applicable to the instant case. In *Smith*, the majority held that a landowner whose property abutted a vacant lot rezoned to allow a fire station was not entitled to relief under the Harris Act because the landowner's property "was not itself subject to any governmental regulatory action." 159 So. 3d at 889. Based on this holding, the court did proceed to engage in an existing use or inordinate burden analysis under the Harris Act.

[3] *See* David L. Powell, Robert M. Rhodes & Dan R. Stengle, *A Measured Step to Protect Private Property Rights*, 23 Fla. St. U. L. Rev. 255 (1995). Discussing the definition of the term "existing use" at play in the Harris Act the authors (who happened to work on the legislation), stated:

> As a legal concept for an existing land use, the alternative definition is well-grounded in the law of eminent domain. In a condemnation proceeding, valuation of the property is based upon the highest and best use. The highest and best use is not limited to those uses authorized under the existing land development regulations. If on the date of taking there is a reasonable probability of a land use change, that probability may be taken into account in determining valuation. An important factor in determining the highest and best

*ii) Compatible with Adjacent Land Uses*

In addition to finding that Appellants did not meet the "nonspeculative land use" prong of the "existing use" definition under the Harris Act, the court also found that Appellants failed to establish that a concrete batch plant was compatible with adjacent land uses at the time the code was amended. The court's conclusion was based on the fact that the land west of the property and half of the land south of the property was zoned for residential use. Although much of that land remained vacant, the court concluded that based on east to west wind patterns, the residential areas would experience noise and dust pollution from the property if it was developed into a concrete batch plant. The court also gave weight to the County's determinations during the code amendment process that "heavy process uses such as concrete plants which involve outdoor storage and handling of large quantities of material that result in noise and dust impacts are more compatible with and appropriately located in IG [General Industrial] districts, removed from concentrations of residential areas and separated from commercial uses and light 'clean' industry."

It is axiomatic that if an area is zoned for a particular use, that use is deemed compatible with surrounding uses. *See Nostimo, Inc. v. City of Clearwater*, 594 So. 2d 779, 781 (Fla. 2d DCA 1992) (holding that use of property was compatible with surrounding or adjacent uses because it was a permitted use under the zoning code). Before the County amended the code, concrete batch plants were a permitted use on Appellants' property. Therefore, the use of the property as a concrete batch plant was *per se* compatible with the surrounding land uses. With this in mind, none of the County's evidence established that anything about the adjacent land uses changed between the time the old IL zoning description was created

> use of property is whether the property is suitable for that proposed future use. However, such a future use may not be wholly speculative. . . .
>
> The proof necessary to establish that a future land use is reasonably foreseeable could come from such authorities as an adopted local comprehensive plan, local land development regulations, or a credible appraisal which relies at least in part on nonexisting but reasonably expected future uses.

*Id.* at 267−68 (footnotes omitted).

and the time it was amended. Accordingly, the court erred when it concluded that a concrete batch plant was not an "existing use" for the property because a concrete batch plant was not compatible with adjacent land uses at the time the code was amended.

    b) <u>Inordinate Burden</u>

The Harris Act provides that the terms "inordinate burden" or "inordinately burdened" mean:

> [T]hat an action of one or more governmental entities has directly restricted or limited the use of real property such that the property owner is permanently unable to attain the reasonable, investment-backed expectation for the existing use of the real property or a vested right to a specific use of the real property with respect to the real property as a whole, or that the property owner is left with existing or vested uses that are unreasonable such that the property owner bears permanently a disproportionate share of a burden imposed for the good of the public, which in fairness should be borne by the public at large. . . .

§ 70.001(3)(e), Fla. Stat. (2008).

Here, although the court denied Appellants relief under the Harris Act based on its existing use analysis, it also cursorily addressed the inordinate burden prong of a claim under the Act, ruling that Appellants could not demonstrate a "reasonable, investment-backed expectation." The court's ruling on this point referenced its takings ruling, wherein the court found that Appellants did not establish that they had a reasonable, investment-backed expectation in developing a concrete batch plant because the "property contained site-specific conditions that entailed significant practical and financial impediments to its development as a concrete batch plant."

There are only two reported cases interpreting the phrase "reasonable, investment-backed expectations" in the specific context of the Harris Act. This Court's opinion in *Palm Beach Polo, Inc. v. Village of Wellington*, 918 So. 2d 988 (Fla. 4th DCA 2006), provides the most guidance. In that case, a developer made a Harris Act claim with respect to a wetland nature preserve which a local government required the developer to "restore, enhance, and preserve" as part of a Planned Unit Development. *Id.* at 990. On appeal, we held that the developer's claim under the Act was "frivolous" because, based on the physical characteristics and regulatory history of

9

the preserve, there could be no reasonable expectation that the preserve would be used for anything other than conservation. *Id.* at 995. Citing our holding in *Palm Beach Polo, Inc.*, the First District later found that a landowner did not have a "reasonable, investment-backed expectation" of developing a parcel of land into a multi-family development after he learned that the only road leading to and from the property was being permanently closed. *Coffield*, 18 So. 3d at 595, 599. These cases establish that whether a landowners expectations for development are "reasonable" and "investment-backed" depends on the physical and regulatory aspects of the property.

Despite the foregoing authority, the court relied on case law from the takings context when analyzing whether Appellants had a "reasonable, investment-backed expectation" of developing the property as a concrete batch plant. The court did so because the term "investment-backed expectations" is found in the test articulated by the United States Supreme Court for regulatory takings. *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 123 (1978). Although, based on the foregoing, it would seem reasonable to rely on takings cases, the Harris Act itself proclaims that it is "separate and distinct . . . from the law of takings" and, to that end, also provides that "[t]his section may not necessarily be construed under the case law regarding takings if the governmental action does not rise to the level of a taking." §§ 70.001(1); 70.001(9), Fla. Stat. (2008). Thus, we hold that the court's reliance on federal takings cases as opposed to Florida law interpreting the Harris Act was misplaced.

Applying the applicable law, nothing about the physical or regulatory aspects of the property at the time of the government regulation made Appellants' expectations for the development of a concrete batch plant unreasonable. A concrete batch plant was a permitted use under the zoning code as a matter of right and throughout the site-plan approval process, Mr. Maib was led to believe that approval was inevitable. Further, Mr. Maib obtained the services of an expert engineer who told him that the development was feasible. Finally, the property abutted a railroad and Mr. Maib was able to install a spur to facilitate the importation and exportation of materials. That the overall undertaking may have been expensive and a significant task does not invalidate the fact that, based on the property itself, Appellants' investment-backed expectations were reasonable.

Based upon the foregoing, we reverse and remand this matter for a trial on damages suffered by Appellants under the Harris Act.

*Affirmed in part, reversed in part and remanded.*

10

TAYLOR AND MAY, JJ., concur.

*       *       *

***Not final until disposition of timely filed motion for rehearing.***