203 So.2d 514 (1967)
Thomas H. ENNIS, Appellant,
v.
WARM MINERAL SPRINGS, INC., a Florida Corporation, Appellee.
No. 7418.
District Court of Appeal of Florida. Second District.
October 27, 1967.
Rehearing Denied November 27, 1967.
*515 Coleman, Leonard, Morse & Morrison, Fort Lauderdale, and Clyde H. Wilson, Sarasota, for appellant.
Millican & Trawick, Sarasota, for appellee.
PIERCE, Judge.
This is an appeal by Thomas H. Ennis, plaintiff below, from a Final Decree entered by the Sarasota County Circuit Court in a suit wherein Ennis sought a declaratory decree, together with an accounting and a money judgment, with reference to an employment contract entered into by him and Warm Mineral Springs, Inc., hereinafter referred to as the corporation.
The contract, of which Ennis sought a judicial interpretation, was in the form of a resolution of the corporation, and, in its essential part, was as follows:
"(5) that the Vice-President, Thomas H. Ennis, be paid twenty-five (25%) per cent of the gross profits before Federal Income Taxes, and * * * the corporation reserves the right to terminate the services of Thomas H. Ennis any time at the discretion of the Directors."
While the issues were complex, the pleadings prolific, and the procedural strategies devious, the Decree disposing of the case was notable mainly for its paucity. We quote it in all its length:
"This cause coming on for final hearing and the Court having considered the evidence of the parties and being otherwise fully advised in the premises, it is hereby,
ORDERED, ADJUDGED and DECREED that:
1. Plaintiff THOMAS H. ENNIS take nothing by his suit and that defendant WARM MINERAL SPRINGS, INC. go hence without day.
2. Jurisdiction is retained for the sole purpose of taxing costs."
*516 A chronological factual background of the parties involved and their relationships may provide a logical approach to their later controversies.
Plaintiff Ennis and one Frederick Matthew Daley had been acquaintances, then friends, over a period of some thirty years. Daley was aware that Ennis had either promoted or been associated with some highly successful Florida real estate developments. In 1955, Ennis approached Daley at his home in Connecticut with a view toward getting him to back Ennis in a development deal. Daley was not interested in the property Ennis sought to acquire at that time, but after Ennis had obtained backing elsewhere and promoted that deal to a rapid and very lucrative conclusion, Daley became more interested. An arrangement was then worked out whereby Ennis would investigate various real property holdings being offered for sale in Florida and made recommendations to Daley as to suitability for development purposes. As his contribution to the joint venture, Ennis was to locate a suitable investment and after acquisition was to furnish the "know-how" and devote full time to the development and promotion of the project. Daley was to provide the necessary funds. Ennis and Daley were to split the profits 50-50, but later Ennis agreed to take 25%.
During the summer of 1955, Ennis traveled extensively over the State of Florida inspecting and appraising various property offerings. Of the some twenty sites which Ennis recommended or referred to him, Daley selected Warm Mineral Springs, formerly Warm Salt Springs, near Sarasota as being best suited to the purposes of the joint partnership venture.
Warm Mineral Springs was owned by a corporation and by purchase of 100% of the stock, Daley became the sole shareholder. So far as we can ascertain from the record, Daley at no time was either an officer or director, the corporate offices being held by non-shareholders, including Ennis as Vice-President, who continued to operate the business as a corporate enterprise, with Daley remaining, at least through the date of the final hearing in the instant case, as sole stockholder. Daley's son-in-law, Samuel H. Herron, Jr., was President of the corporation and Daley's daughter, Doris Herron, appeared to be the Secretary, at least ex-officio. Although Doris Herron was not officially listed as Secretary, she apparently acted as such and was present at all board meetings and participated in all discussions of corporate business.
Warm Mineral Springs, Inc. was organized for the purpose of subdividing the large tract of land purchased, and developing and selling the lots subdivided at a profit. The corporation was organized on October 8, 1955, the date the assets of Warm Mineral Springs were purchased by Daley. Shortly thereafter at the stockholders' and directors' meetings, the corporate resolution hereinbefore first quoted was adopted, outlining the status of Ennis's participation. Ennis had agreed, at Daley's urging, to take his 25% from the gross profits rather than the net profits of the corporation, because of Federal Tax considerations. The resolution also provided that Ennis as Vice-President would receive $600 (later raised to $700) per month "draw" against his share of such profits.
Things rocked along for a few years, the corporation enjoying a notable degree of success, with Ennis providing the necessary impetus and know-how. An annual accounting was made and Ennis was paid a share of the profits, admittedly not amounting to "25% of gross profits". In April, 1958, Ennis was fired (later permitted to submit his resignation). Daley asked Ennis to come to Daley's home, and when he arrived, Daley informed him his services were no longer required. Daley told him he had "some money" coming and offered Ennis a check in the amount of $12,497.86 as payment in full of all remaining sums due and at the same time presented to him various documents of waiver and release of all claims against *517 Warm Mineral Springs, Inc. Ennis declined the check and refused to sign the documents.
On September 15, 1958, Ennis filed his instant complaint, alleging the corporate resolution and his employment thereunder, and seeking a declaratory decree as to his rights and status, directed mainly at an interpretation of the term "gross profits" as used in the contract, and particularly whether "accounts receivable" should be included in "gross profits"; also whether sums used for capital improvements, i.e., in developing more lots for future sale, were properly deductible by the corporation before computation of the 25% share for Ennis.
It will be perceived that the Chancellor in his Final Decree never actually determined whether or not Ennis was entitled to a declaration of his rights, although respective motions of the parties for summary judgments were denied.
F.S. Sec. 87.02 F.S.A., in its pertinent parts, reads:
"Any person * * * in doubt * * * or whose rights * * * are affected by a * * * contract * * * or instrument in writing may have determined * * * and obtain a declaration of rights, status * * * or legal relations thereunder."
In Rosenhouse v. 1950 Spring Term, etc., Fla. 1952, 56 So.2d 445, the trial Court had dismissed a declaratory judgment action without indicating whether the dismissal was because plaintiff was not entitled to have his rights determined or whether he was not entitled to the ultimate relief prayed. The Supreme Court reversed and held that 
"The test of the sufficiency of a complaint in a declaratory judgment proceeding is not whether the complaint shows that the plaintiff will succeed in getting a declaration of rights in accordance with his theory and contention, but whether he is entitled to a declaration of rights at all."
To the same effect, see Platt v. General Development Corp., Fla.App. 1960, 122 So.2d 48; Hankins v. Title & Trust Co. of Fla., Fla.App. 1964, 169 So.2d 526; Modernage Furniture Corp. v. Miami Rug Co., Fla. 1955, 84 So.2d 916; and Johnson v. Thoburn, Fla.App. 1964, 160 So.2d 729.
Ennis contends here that the trial Judge under Section 87.02, should have declared his rights by interpreting the corporate resolution (employment contract), where a dispute admittedly existed as to the true meaning and effect of the resolution. The corporation counters that the suit was actually one for an accounting and damages, and that a construction of the resolution by the Court was not necessary, also that a declaratory decree is only appropriate when one is seeking a guide to future conduct.
As to the latter contention, we find nothing in Section 87.02 that so limits its scope. Nor does the fact that Ennis also sought an accounting and a money judgment preclude a declaratory decree. This is implicit in F.S. Sec. 87.01, F.S.A. which vests original jurisdiction in the Circuit Court to declare a litigant's rights "whether or not further relief is or could be claimed or prayed".
Considerable testimony was taken and a declaratory decree should have been entered, adjudicating the rights of Ennis in the subject matter of the suit. Such "declaration" may not have given him his "heart's desire", but in all fairness after eight years of litigation he was entitled to know whether and to know why. See May v. Holley, Fla. 1952, 59 So.2d 636. And if the Chancellor felt that Ennis was not entitled to a declaratory decree, both parties should have been so informed, and they could have molded their subsequent litigious procedures accordingly.
Perforce, it has made mandatory upon us the task to analyze and dissect the *518 voluminous record ourselves to determine, first, whether the showing made by Ennis entitled him to a declaration of his rights, and second, if so, whether he was entitled to the further relief prayed for in his complaint. Upon a rather painstaking review of the entire record, we are impelled to hold with Ennis on both items, although we must leave to the Court below the final determination of the accounting.
Ennis contends that, in construing the employment contract, the term "gross profits" should be held to include accounts receivable, i.e., the unpaid deferred balances upon the purchase price of parcels of the Warm Mineral Springs property sold to purchasers and evidenced and secured by notes and mortgages or by executory contracts of sale. He also contends that revenue derived by the corporation from the sale of lots which was "ploughed back" into the developing and improvement of other lots for future sale by the corporation, thereby increasing its capital worth at the expense of what would otherwise be presently enhanced profits, should likewise be included in "gross profits".
The corporation disputes these assertions, and, while admitting the employment contract, contends that under the contract Ennis was to share only in cash received from current sales less operating expenses and costs of land improvements for future sales; and that Ennis so understood and acquiesced while he was affiliated with the corporation.
Ennis denies any such "understanding" on his part and asserts his understanding to be that "gross profits" meant whatever was received by the corporation, either presently or in evidenced anticipation, over and above only the current expenses and liabilities.
The Courts of Florida have laid down some applicable rules governing construction of uncertain or ambiguous provisions of contracts. The rule of reason prevails, that a contract will be construed in such manner as is most equitable to the parties, to the end that one party shall not have an unfair or unreasonable advantage over the other. Lee v. Clearwater Growers' Ass'n, 1927, 93 Fla. 214, 111 So. 722; Hall v. Hardaker, 1911, 61 Fla. 267, 55 So. 977; Diversified Enterprises, Inc. v. West, Fla. App. 1962, 141 So.2d 27. If a contract is susceptible of two constructions, one of which makes it fair, customary, and such as a prudent man would naturally execute, while the other would make it inequitable and unnatural, the reasonable, logical and rational interpretation should be adopted. Morton v. Ansin, Fla.App. 1961, 129 So.2d 177; Bursten v. Green, Fla.App. 1965, 172 So.2d 472; Triple E Development Co. v. Floridagold Citrus Corp., Fla. 1951, 51 So.2d 435. Words and phrases should be given their natural meaning, or a meaning most commonly understood in relation to the subject matter and circumstances, and an agreement will not be interpreted so as to place one contracting party at the mercy of the other unless it is clear that such was their intention at the time the agreement was made. Sheldon v. Tiernan, Fla.App. 1962, 147 So.2d 167.
The corporation argues that if Ennis were allowed to participate in accounts receivable, it could result in his "getting rich" in a year in which the corporation suffered loss. This position is untenable for the reason that Ennis would not have to be paid in cash upon what the corporation earned in a year in both cash and deferred payments. But it would not necessarily follow that his right to be paid his requisite share would "go down the drain" merely because the corporation was willing to take a part, even most, of the purchase price in deferred payments rather than cash. He would simply receive his additional compensation if and when the future payments were made.
Furthermore, carried to its logical extreme, the corporation could require as little as 1% down on the installment sales of lots, which conceivably could result in Ennis *519 owing money to the corporation during years in which he had actually generated thousands of dollars in business for the benefit of the corporation. Such a result would be unconscionable, and under the decisions before cited the employment contract cannot be so interpreted.
Perhaps the real "philosophy" influencing the corporation in its contentions may be gleaned from the uncontroverted[1] testimony of Ennis, who stated that when he was fired, Daley told him "you are not entitled to participate in the accounts receivable". When asked why, Daley said, "Because they have not accrued; and when they do accrue you won't be here".
Another circumstance of significance in this connection occurred after Ennis left the corporation. An audit of the corporation books was made by the Federal Internal Revenue, resulting in an adjustment totalling $165,458.54 as additional taxable income for the years in which Ennis was employed. The discrepancy was apparently not a wilful attempt at evasion of taxes but resulted from an improper accounting method, i.e., the corporation was reporting only cash received on the installment sales, whereas it should have reported the full amount of sale.
The corporation conceded that, predicated on the Federal computation of additional taxable income, the amount payable to Ennis would be increased by $21,002.80. Ennis contended additional sums due to him should have placed the figure in the neighborhood of $40,000.00, but this is something the lower Court must examine after remand.
The corporation seemingly puts its main reliance on the affirmative defense of estoppel and waiver, first advanced as an amendment to its answer on August 26, 1964, some six years after the filing of Ennis's complaint. The corporation predicates such defense upon the proposition that Ennis as Vice-President had available to him all financial statements of the corporation, that the method used to compute his compensation was known to him, and that he never voiced an objection. This argument is stated succinctly in the corporation's brief here, in the following language:
"The actions of the Plaintiff in remaining silent, making known no disagreement he might have had until after he quit work, misled the Defendant, lulled it into a false sense of security that the amount of compensation and the method used to arrive at the amount was satisfactory to the Plaintiff, and by such actions or omissions on the part of the Plaintiff, the Defendant was placed at a disadvantage, as it had the right to discharge the Plaintiff at any time."
But such contention, in the light of the record before this Court, cannot hold water, either factually or as a matter of law. The burden of proving estoppel rests upon the party invoking it. Connelly v. Special Road & Bridge Dist. No. 5, 1930, 99 Fla. 456, 126 So. 794, 71 A.L.R. 923. As said in Erwin v. Dekle, 1910, 60 Fla. 56, 53 So. 441: "[e]very fact essential to an estoppel in pais must be clearly and satisfactorily proved".
While Daley asserts that Ennis appeared contented and never expressed dissatisfaction as to the compensation he was receiving or "drawing down", Ennis with equal vehemence contends that he asked Daley numerous times when they would have the "melon cutting" only to be told that "the corporation doesn't have any money, putting it back into improvements". Ennis's version appears to us equally as logical and consistent in the light of the actions of the parties and subject matter of the suit. In any event, the corporation did not carry the evidentiary burden.
But even assuming the corporation's version, estoppel or waiver would *520 not follow. Estoppel does not arise merely from silence or acquiescence. There must be special circumstances requiring the one sought to be estopped to speak. Neal v. Gregory, 1882, 19 Fla. 356. And the party against whom estoppel is sought must have, by virtue of his silence, caused the other party to change his position to his injury. 12 Fla.Jur. § 24, p. 401.
The rule is well stated in 31 C.J.S. Estoppel § 87, beginning on page 485:
"Mere silence of itself will not raise an estoppel. To make the silence of a party operate as an estoppel the circumstances must have been such as to render it his duty to speak, and there must also have been an opportunity to speak.
"It is essential that the one claimed to be estopped should have had knowledge of the facts, and that the adverse party should have been ignorant of the truth, and have been misled into doing that which he would not have done but for such silence. Silence will not support an estoppel unless the person claiming an estoppel justifiably relied on the silence to his prejudice, and such conduct in reliance must be intended or reasonably anticipated by the one who remained silent.
"One cannot claim an estoppel based on silence where he had actual knowledge of the facts or the means of acquiring knowledge. One may not fail to avail himself of readily accessible sources of information and rely on the silence of another who has been guilty of no act calculated to induce the party claiming ignorance to refrain from investigating." (Emphasis supplied).
Nowhere do we find in the record that the corporation's position was ever changed, either voluntarily or involuntarily, nor that it was ever prejudiced. Estoppel is a doctrine to prevent injustice rather than to foster it, and is untenable here upon grounds of pure logic as well as established law. 12 Fla.Jur. § 28, p. 403; Therrell v. Reilly, 1932, 111 Fla. 805, 151 So. 305.
Several procedural questions are raised by the parties, but only one need be mentioned here. The testimony of Daley was taken by deposition and at the trial was offered in evidence. Strangely enough, the corporation objected, claiming that Daley was not an agent or officer of the corporation and therefore his testimony was not proper to be considered against the corporation, citing Mease v. Warm Mineral Springs, Inc., Fla.App. 1961, 128 So.2d 174. But Mease is not authority here, where Daley was the sole owner of the corporation, which was actually the alter ego of Daley. Objection was also made to introduction of the deposition because not within any of the admissible categories set forth in then Rule 1.21(d), 30 F.S.A., but we think it came within sub-division (2) thereof which permitted use of a deposition of "anyone who * * * was * * * managing agent of a * * * corporation * * which is a party * * *". Daley certainly qualified.
We reverse on the merits and hold that Ennis was entitled to have a decree entered declaring his rights in the employment contract, that he is entitled to an accounting of the "gross profits" during the time he was employed, according to the meaning of such term as herein held, and to have a money judgment entered up for 25% of the amount so found and not heretofore paid, and such other relief as is necessary or incidental thereto. Such accounting shall be under the supervision of the Chancellor upon remand, to be followed accordingly by entry of a new final decree.
Reversed and remanded, with directions aforesaid.
SHANNON, Acting C.J., concurs.
ADAMS, GEORGE E., Associate Judge, dissents with opinion.
*521 ADAMS, GEORGE E., Associate Judge (dissenting).
I respectfully dissent. The majority opinion in this case merely weighs the testimony which was adduced before the trial court. This Court can only determine whether there was substantial competent evidence to support the judgment of the lower court. There are substantial conflicts in the testimony produced before the trial court on nearly every critical fact recited in the majority opinion.
It appears to this writer that since the contract of employment as contained in the minutes of the corporation was ambiguous, that testimony and evidence adduced before the trial court must be resorted to in order to determine what the contract meant. There was substantial competent evidence before the trial judge from which he could have found that the contract of employment was a contract for 25% of the gross profits received in cash by the corporation, the term gross profits meaning actually profits after all expenses were paid, except payment of federal income taxes. This, in fact, appears to be the construction placed upon the contract by the Plaintiff, as reflected by his testimony on Page 75 of the record.
The majority further holds that it was error for the lower court to refuse to receive in evidence the deposition of Daley who owned all of the stock of the corporation. In Mease v. Warm Mineral Springs, Inc., Fla.App. 1961, 128 So.2d 174, this Court in an opinion by Judge Kanner held that admissions and statements by this same man Daley who was then the owner of all of the stock of this same corporation were not binding on the corporation. This being the law, then it seems impossible to me that Daley would come within the meaning of Rule 1.280(d) (2) as an officer, director or managing agent of this corporation. If such a deposition is admissible, then the declarations and admissions of such an owner should also be binding on the corporation.
The majority in this case further holds that the Plaintiff is entitled to a declaration of his rights. At the time of the action herein, whatever rights the Plaintiff had had accrued to him and whatever sums were due were then determinable. I can think of no more effective way to declare such a Plaintiff's rights than to deny him any relief.
For the reasons above stated, I would affirm the judgment of the lower court.
NOTES
[1] Mr. Daley never appeared as a witness, although his deposition was earlier taken and later disallowed in evidence.