BENTON, J.
 

 The City of Jacksonville appeals the non-final jury impanelment order entered in a case Harold Coffield brought pursuant to section 70.001, Florida Statutes (2006), the Bert J. Harris, Jr., Private Property Rights Protection Act (the “Act”). We have jurisdiction.
 
 See
 
 § 70.001 (6)(a), Fla. Stat. (2006); Fla. RApp. P. 9.030(b)(1)(B), 9.130(a)(3)(C)(viii) (2009).
 

 I.
 

 In early 2006, Mr. Coffield signed a contract for the purchase of approximately two acres from James and Loretta Floyd. The parcel is on the St. Johns River in Jacksonville, adjacent to Windsong Place subdivision, and to a street also named Windsong Place. The agreed sales price was $550,000. Originally, the sale was to close (if at all) on April 30, 2006: Mr. Coffield made a deposit of $25,000 on January 24, 2006, which, the contract provided, the Floyds had to return if, within 60 days, Mr. Coffield determined, “in [his] sole and absolute discretion,” that the property was not suitable for development as residential, single-family lots. He intended to develop the property into eight such lots, each with access from Windsong Place, then a public road in the subdivision.
 

 On February 8, 2006, however, the Windsong Place Homeowners’ Association, Inc., filed an application with the City for closure and abandonment of the Windsong Place roadway in order to make it a private, gated road, and so preclude public access. George Paul, the City employee who had been in charge of processing road closure applications for four years, testified that he could not remember any application to close a public road — of which the City receives 45 to 70 per year — that the City denied during his tenure, although he recalled some that were withdrawn in the face of public opposition.
 

 Mr. Coffield learned of the application to close the roadway on February 15, 2006, more than five weeks before the agreed deadline for rescinding the contract and recouping his $25,000 deposit. He decided to proceed with his development plans nevertheless, based in part on what proved to be his mistaken belief that the City would not grant the application for road closure;
 
 [1]
 
 and in part on the legal mistake that, even if the City did grant the application and close the public road, he would have title to half of the fee interest underlying the abandoned roadway easement.
 
 [2]
 
 One way
 
 *592
 
 or another, he assumed, access would be available from (perhaps a narrower) Wind-song Place. On February 17, 2006, the Floyds executed a notarized document which authorized Mr. Coffield to act on their behalf in connection with the pending application to close the public roadway.
 

 Eventually, the Floyds and Mr. Coffield agreed to extend the deadline for the real estate closing in exchange for Mr. Cof-field’s additional deposit of $15,000. Meanwhile, on March 22, 2006, the City issued a Concurrency Reservation Certifí-cate (“CRC”) for the proposed development, predicated on “Final Engineering.” In January or February of 2006, Mr. Cof-field had begun clearing the property and hiring surveyors and engineers to prepare surveys and plans. The CRC provided: “This development is hereby reserved capacities for potable water, sanitary sewer, solid waste, recreation, roads, mass transit, and drainage.”
 

 On May 31, 2006, Mike Sands, an employee of the City, wrote a letter to Mr. Coffield, which stated that “[a]t this time, driveway connection permits can be issued with proper applications, bonds, and associated fees.” Mr. Sands testified that his office issues driveway connection permits as a matter of course, on proper application, if a roadway is public, the required fees are paid and any required bonds are posted. No application was actually made in the present case and no driveway connection permit actually issued. Nor were fees paid nor any bond posted for driveway connection permits.
 

 On or around June 5, 2006, the sale closed. On August 17, 2006, the City enacted Ordinance 2006-407-E: “An ordinance closing and abandoning Windsong Place, at the request of Windsong Place Homeowners’ Association, Inc., to allow the right-of-way to become a private road.... ” In light of the new ordinance, on September 26, 2006, the City wrote a letter to Mr. Coffield, stating: “The proposed site layout for the Windsong Place subdivision indicated] that the lots, after subdivision, will access Windsong Place. The [right-of-way] for Windsong Place has been closed and abandoned as a public road.... Please provide the Development Management Group with documentation that the proposed subdivision lots will have access to the private road for ingress and egress, essential services, etc.” Sean Kelly, a City employee, testified that abandonment of the public right-of-way stymied the proposed development because the property could not be subdivided into eight lots without access from Windsong Place.
 

 Access was not the only obstacle to issuing permits for the development on September 26, 2006, Michael Sands testified. According to Mr. Sands, the biggest hurdle remaining was a prerequisite Conditional Letter of Map Revision. Before that could be issued, he testified, a flood study had to be conducted, and no flood study had been done. But he did not testify that the access problem was not an impediment to the eight-lot subdivision originally contemplated. The evidence suggested that, without access from Wind-song Place, no more than two houses could be built.
 

 
 *593
 
 On November 20, 2006, Mr. Coffield conveyed the property to a wholly owned entity, Windsong Place, LLC (the LLC). On December 19, 2006, Mr. Coffield and his alter ego, the LLC, filed in circuit court, purporting to set out a claim under section 70.001, Florida Statutes, against the City, and alleging damages in the amount of $2,212,000 as a result of their inability to proceed with the proposed development, which the complaint attributed to the closure of Windsong Place as a public road.
 

 After a hearing on May 15, 2008, the trial court concluded that the City had made representations which “would lead a reasonable person to believe that the development of the Property could still proceed despite the application for abandonment of the roadway.” The order under review determined that Mr. Coffield had a vested right to develop the property into eight single-family homes, ruling that development for that purpose was an “existing use” of the property. The trial court determined that, by enacting Ordinance 2006-407-E and by writing the letter of September 26, 2006, the City had “inordinately burdened” an “existing use,” and ordered that a jury be impaneled to assess the amount of damages Mr. Coffield and the LLC had suffered as a result. The City appeals this order.
 

 II.
 

 At the outset, we address the City’s interlocking arguments that neither Mr. Coffield nor the LLC were proper parties plaintiff, and that their complaint should have been dismissed on that basis. Citing
 
 Palm Beach Polo, Inc. v. Village of Wellington,
 
 918 So.2d 988, 995 (Fla. 4th DCA 2006), the City argues that the LLC is entitled to no relief because it acquired the property only after the City had abandoned the public right-of-way. Since closure of Windsong Place as a public street precluded subdivision into eight lots (at least without an easement from the homeowners’ association), the City contends the development restriction complained of was already in place when the LLC acquired the property; and that the LLC could have had no reasonable, investment-backed expectation at the time of acquisition that it was not subject to the restriction.
 
 See generally Palazzolo v. Rhode Island,
 
 533 U.S. 606, 626, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001).
 

 As for Mr. Coffield personally, the City contends, the Act provides that only the “property owner” is eligible for relief, and section 70.001(3)(f) of the Act defines “property owner” as “the person who holds legal title to the real property at issue.” By the time the lawsuit was filed, Mr. Coffield had divested himself of legal title by conveying the property to the LLC. Since he no longer holds legal title to the property personally, the City argues, Mr. Coffield is ineligible personally for any relief under the Act.
 

 This court rejected similar arguments in
 
 Equity Resources, Inc. v. County of Leon,
 
 643 So.2d 1112, 1117 (Fla. 1st DCA 1994), which was not, however, decided under the Act. There we said:
 

 ... As earlier noted, at the time the vested rights application was filed, Pel-ham and his wife jointly owned all of the stock in Equity Resources, Inc., the title ■ holder of the property in question. Since Equity Resources acquired its interest from other Pelham controlled or owned entities, it merely served as a successor entity through which the Pel-hams continued to hold an interest, albeit equitable in nature, in the ownership and development of the land in the project. In short, Pelham’s transfer of the property to Equity Resources from other entities owned or controlled by him did not necessarily extinguish his
 
 *594
 
 interest in the property for purposes of his standing to seek a determination of vested rights to continue development of the property.
 

 [[Image here]]
 

 ... Equity Resources is not an independent corporation, unrelated to Pel-ham, that obtained its interest in the land as a stranger to the project. On the contrary, it is an entity that was created and controlled by Pelham to hold the land and consummate the development initiated by Pelham.
 

 643 So.2d at 1117-18. For purposes of decision, although without deciding the question, we assume that, because Mr. Coffield and the LLC are alter egos and both have sued, they are entitled to an adjudication of their rights under the Act.
 

 III.
 

 On this assumption, it properly fell to the circuit court to “determine whether an existing use of the real property or a vested right to a specific use of the real property existed and, if so, whether, considering the settlement offer and ripeness decision, the [City had] inordinately burdened the real property.” § 70.001(6)(a), Fla. Stat. (2006). Determinations under the Act that a claimant has “an existing use of the real property or a vested right to a specific use of the real property” and that government action has permanently precluded the claimant from attaining “the reasonable, investment-backed expectation for the existing use of the real property or a vested right to a specific use of the real property” are conclusions of law. § 70.001(3)(e) & (6)(a), Fla. Stat. (2006).
 

 We review conclusions of law
 
 de novo. See, e.g., Williams v. Cadlerock Joint Venture, L.P.,
 
 980 So.2d 1241, 1243 (Fla. 4th DCA 2008) (“We review all legal determinations
 
 de novo,
 
 but test findings of fact to see if they are supported by competent, substantial evidence.” (citing
 
 State v. Glatzmayer,
 
 789 So.2d 297, 301 n. 7 (Fla.2001))). Although, in important respects, we disagree with the learned trial judge’s legal analysis, we begin, with deference to the trial court’s fact finding, from the same statutory premise.
 

 IV.
 

 Section 70.001, Florida Statutes provides a remedy for property owners whose property has been “inordinately burden[ed]” by government action that does not, however, rise to the level of a constitutional taking. § 70.001(1), Fla. Stat. (2006). The Act provides: “When a specific action of a governmental entity has inordinately burdened
 
 [3]
 
 an existing use of real property or a vested right to a specific use of real property, the property owner of that real property is entitled to relief....” § 70.001(2), Fla. Stat. (2006).
 

 Few cases interpret the substantive provisions of the Act,
 
 [4]
 
 or elaborate on the
 
 *595
 
 statutory definitions of “inordinate burden” and “investment-backed expectation.” In
 
 Palm Beach Polo,
 
 however, the Fourth District concluded there could be no reasonable, investment-backed expectation in developing land that had long been designated a natural reserve, 918 So.2d at 995, and in
 
 Holmes v. Marion County,
 
 960 So.2d 828 (Fla. 5th DCA 2007), the Fifth District held that “issuance of a time-limited permit cannot create a reasonable expectation that the specially permitted use will be allowed to continue indefinitely.”
 
 Id.
 
 at 830.
 

 V.
 

 The Act imports an important body of case law, however, when it provides that the “existence of a ‘vested right’ is to be determined by applying the principles of equitable estoppel or substantive due process under the common law or by applying the statutory law of this state.” § 70.001(3)(a), Fla. Stat. (2006). The Act specifies that “[t]he term ‘existing use’ means an actual, present use or activity on the real property, including periods of inactivity which are normally associated with, or are incidental to, the nature or type of use or activity or such reasonably foreseeable, nonspeculative land uses which are suitable for the subject real property and compatible with adjacent land uses and which have created an existing fair market value in the property greater than the fair market value of the actual, present use or activity on the real property.” § 70.001(3)(b), Fla. Stat. (2006).
 

 The trial court apparently concluded that Mr. Coffield’s intentions to subdivide the parcel into eight lots and build single family houses were “reasonably foreseeable, nonspeculative land uses....”
 
 Id.
 
 This was error. Plainly eight single-family lots were never “an actual, present use or activity on the real property.” § 70.001(3)(b), Fla. Stat. (2006). Nor did Mr. Coffield or the LLC ever have a vested right
 
 [5]
 
 to develop the property into eight single-family lots. On February 15,
 
 *596
 
 2006, when Mr. Coffield learned of the homeowners’ association’s application to close the roadway which provided the ingress and egress essential to his development plans, he had effectively no more than an option to purchase the property.
 

 Actions he took after February 15, 2006, were with full notice that the roadway might be closed, preventing the development he contemplated. As a technical matter, the evidence did not establish any financial outlay — aside from the refundable deposit — prior to his knowledge of the application to close the public road.
 
 [6]
 
 Once Mr. Coffield learned that an application had been filed to close the only roadway providing ingress and egress to the property, development of the property into eight single-family lots was, if still a possibility, by no means a “reasonably foreseeable, nonspeculative,” use of the property. § 70.001(3)(b), Fla. Stat. (2006).
 

 Development of the property into eight single-family lots was never an “existing use” of the property or a “vested right.” Mr. Coffield went forward based on mistaken assumptions. He speculated— wrongly, as it turned out — that the public road would not be closed, and that he could develop the property into eight residences regardless of whether the roadway was closed. He testified that he “went along under that assumption for the longest period of time until basically [he] got the letter [from the City on September 26, 2006].”
 
 [7]
 
 Mr. Coffield’s misapprehensions conferred no legal rights.
 

 
 *597
 
 VI.
 

 Equitable estoppel principles reinforce this conclusion. Equitable estoppel is appropriate where the proof shows “(1) a property owner’s good faith reliance (2) on some act or omission of the government and (3) a substantial change in position or the incurring of excessive obligations and expenses so that it would be highly inequitable and unjust to destroy the right he acquired.”
 
 Equity Res. Inc. v. County of Leon,
 
 643 So.2d 1112, 1117 (Fla. 1st DCA 1994) (quoting
 
 Franklin County v. Leisure Props., Ltd.,
 
 430 So.2d 475, 479 (Fla. 1st DCA 1983)). In a land use context, "we said:
 

 One party will not be permitted to invite another onto a welcome mat and then be permitted to snatch the mat away to the detriment of the party induced or permitted to stand thereon. A citizen is entitled to rely on the assurances or commitments of a zoning authority and if he does, the zoning authority is bound by its representations, whether they be in the form of words or deeds....
 

 Id.
 
 at 1120 (quoting
 
 Tomi of Largo v. Imperial Homes Corp.,
 
 309 So.2d 571, 573 (Fla. 2d DCA 1975)). Thus a necessary precondition for equitable estoppel against the government is a governmental act or omission that invites a citizen “onto a welcome mat.” Here no action or omission on the part of the City reasonably led Mr. Coffield to believe that his proposed development could proceed
 
 in the event the City closed or abandoned the roadway.
 

 Neither of the governmental acts to which Mr. Coffield points (issuing the CRC on March 22 and sending the Sands letter about driveway connection permits on May 31) amount, even metaphorically, to “a welcome mat.”
 

 A.
 

 “[L]ocal concurrency management systems are a central feature of Florida’s growth management process.
 
 [8]
 
 They are based on the requirement that development approvals should not be granted by local governments unless required public
 
 *598
 
 facilities and services will be available concurrently with the impacts of development.” Thomas G. Pelham,
 
 Restructuring Florida’s Growth Management System: Alternative Approaches to Plan Implementation and Concurrency,
 
 12 U. Fla. J.L. & Pub. Pol’y 299, 299-300 (2001). “The purpose of the concurrency management system is to establish an ongoing mechanism which ensures that public facilities and services needed to support development are available concurrent[ly] with the impacts of such development.” Fla. Admin. Code R. 9J-5.0055 (2008). “Concurrency is a land use regulation which controls the timing of new real estate development so adequate public facilities will be available to accommodate the impacts of that new development.” David L. Powell & Michele Gazica,
 
 And Now ... School Concurrency,
 
 79 Fla. B.J., Nov. 2005, at 44.
 

 The CRC which the City issued on March 22, 2006, served only to “reserve[ ] capacities for potable water, sanitary sewer, solid waste, recreation, roads, mass transit, and drainage.” It did not constitute a development order, did not authorize subdivision, and did not permit construction. The City’s Ordinance Code explains that a CRC is issued whenever it is determined that a proposed development “will not result in the reduction of the adopted level of service standards for impacted potable water, sanitary sewer, recreation, drainage, solid waste, traffic circulation and mass transit facilities and services .... ” § 655.105(i), Jacksonville Ordinance Code (2006). The only representation the City made in issuing the CRC was that these facilities and services — -the pertinent infrastructure — were in existence and that their absence or insufficiency could not preclude the proposed development. On this point, the City has never wavered.
 

 B.
 

 Similarly, the letter written by Mike Sands afforded no basis for reasonable reliance. The letter was careful to say,
 
 “[a]t this time,
 
 driveway connection permits can be issued with proper applications, bonds, and associated fees.” (Emphasis supplied.) Mr. Sands testified that his office issues driveway connection permits as a matter of course
 
 so long as the connecting roadway is public,
 
 the proper application is submitted, and the required fees are paid and bonds posted. By May 31, ,2006, when the letter was written, Mr. Coffield had known for three and a half months (since February 15, 2006) that an application to close the connecting road was pending. Mr. Sands’s letter does not address the effect granting the pending application would have. Importantly, no driveway connection permit was ever issued — or even applied for.
 

 C.
 

 There was, in short, no act or omission on the part of the City upon which Mr. Coffield could reasonably rely. The present case differs dramatically from
 
 Town of Largo v. Imperial Homes Corp.,
 
 where property was initially rezoned at the developer’s request specifically in order to allow multiple-family high-rise apartments. 309 So.2d 571, 572 (Fla. 2d DCA 1975). Only after this rezoning did the developer purchase the property.
 
 Id.
 
 The following year, an adjacent tract came on the market.
 
 Id.
 
 After receiving assurances from town officials that the second tract was also suitable for multiple-family development, the developer purchased that tract as well.
 
 Id.
 
 Some three years later, when the developer agreed to limit development on the first parcel to 24 units per acre and to use the second parcel for recreational purposes only, the town rezoned all of the property to allow 39 units per acre.
 
 Id.
 
 A
 
 *599
 
 few months later, however, after the political winds shifted, the town voted to rezone the property to allow no more than 2.5 units per acre.
 
 Id.
 

 In contrast, Mr. Coffield learned of the application to close the roadway before the City issued the CRC or Mike Sands wrote the letter, and long before closing on the real estate transaction.
 
 See Abrahim-Youri v. United States,
 
 36 Fed.Cl. 482, 486 (1996) (“In assessing the reasonableness of investment-backed expectations, the question we ask is whether plaintiffs reasonably could have anticipated that their property interests might be adversely affected by Government action. Where such intrusion is foreseeable, the commitment of private resources to the creation of property interests is deemed to have been undertaken with that risk in mind; hence, the call for just compensation on grounds of fairness and justice is considerably diminished.”). The City took no action upon which Mr. Coffield could reasonably have relied, and certainly none before February 15, 2006. Without a basis for reasonable reliance, equitable estoppel principles do nothing to bolster his or the LLC’s claim to a vested right to develop the property into eight single-family lots.
 

 VII.
 

 The City’s enactment of the Ordinance closing and abandoning the roadway, followed by the letter of September 26, 2006, did not inordinately burden any “reasonable, investment-backed expectation for the existing use of the real property or a vested right to a specific use of the real property .... ” § 70.001(3)(e), Fla. Stat. (2006). Mr. Coffield did not have a vested right to develop the property into eight single-family homes nor did development of the property into eight single-family lots constitute an existing use of the property.
 

 Any expectation Mr. Coffield had of developing the property in this fashion was not objectively reasonable, once he discovered that an application had been filed to close the only roadway which would provide access to the proposed lots. His assumptions that the application would be denied and that, in any event, he would not lose access to a critical portion of the roadway were incorrect and unsupported. He was not prevented from attaining any “reasonable, investment-backed expectation” of developing the property. § 70.001(3)(e), Fla. Stat. (2006).
 

 In sum, the trial court erred, as a matter of law, in concluding that either Mr. Coffield or the LLC ever had a vested right to develop the property as eight single-family homes, that development as eight single-family lots was an existing use of the property, and that the City took any action which constituted an inordinate burden or precluded attaining any reasonable, investment-backed expectation. Accordingly, we reverse the jury impanelment order, and remand with directions that the claim be dismissed.
 

 Reversed.
 

 KAHN and BROWNING, JJ., concur.
 

 [1]
 

 . Mr. Coffield testified he thought that Wind-song Place's homeowners' association had fewer than 15 members, and could not, therefore, change its by-laws. While requiring the association to maintain drainage facilities, the by-laws did not authorize assessments for other purposes. Section 336.125, Florida Statutes (2006), allows a county's governing body to convey an interest in a public road to a relevant homeowners' association, provided,
 
 inter alia,
 
 the homeowners’ association is a " 'homeowners' association’ as defined in s. 720.301(9) with the power to levy and collect assessments for routine and periodic major maintenance and operation of street lighting, drainage, sidewalks, and pavement in the subdivision.” § 336.125(l)(a)3., Fla. Stat. (2006). For this reason, Mr. Coffield testified, he thought the homeowners’ association’s application would be denied.
 

 [2]
 

 . His erroneous assumption might have been that the fee underlying the roadway had belonged to ("been vested in”) the City. Section 336.12, Florida Statutes (2006), provides:
 

 The act of any commissioners in closing or abandoning any such road, or in renouncing or disclaiming any rights in any land delineated on any recorded map as a road,
 
 *592
 
 shall abrogate the easement theretofore owned, held, claimed or used by or on behalf of the public and the title of fee owners shall be freed and released therefrom; and if the fee of road space has been vested in the county, same will be thereby surrendered and will vest in the abutting fee owners to the extent and in the same manner as in case of termination of an easement for road purposes.
 

 In fact, the fee interest "freed and released” by closing the roadway was entirely the property of the Windsong Place subdivision.
 

 [3]
 

 3. The Act provides that the
 

 terms 'inordinate burden' or ‘inordinately burdened' mean that an action of one or more governmental entities has directly restricted or limited the use of real property such that the property owner is permanently unable to attain the
 
 reasonable, investment-backed expectation for the existing use of the real property or a vested right to a specific use of the real property
 
 with respect to the real property as a whole, or that the property owner is left with existing or vested uses that are unreasonable such that the property owner bears permanently a disproportionate share of a burden imposed for the good of the public, which in fairness should be borne by the public at large.
 

 § 70.001 (3)(e), Fla. Stat. (2006) (emphasis supplied).
 

 [4]
 

 . We have found no case in which an appellate court has affirmed relief granted pursuant to the Act.
 
 See Frye v. Miami-Dade County,
 
 2 So.3d 1063 (Fla. 3d DCA 2009) (claim under Act not preserved for appeal and, in
 
 *595
 
 any event, without merit);
 
 Osceola County v. Best Diversified, Inc.,
 
 936 So.2d 55, 59-60 n. 5 (Fla. 5th DCA 2006) (claim under Act failed without bona fide appraisal required by Act);
 
 Brevard County v. Stack,
 
 932 So.2d 1258, 1261-62 (Fla. 5th DCA 2006) (upholding constitutionality of Act and remanding case to trial court to make findings required by Act);
 
 Charlotte County Park of Commerce, LLC v. Charlotte County,
 
 927 So.2d 236, 239 (Fla. 2d DCA 2006) (holding that parties can settle a claim under the Act even though no lawsuit has been filed and remanding for determination whether settlement agreement was intended to resolve claim under Act);
 
 Russo Assocs., Inc. v. City of Dania Beach Code Enforcement Bd.,
 
 920 So.2d 716, 718 (Fla. 4th DCA 2006) (claim under Act, seeking relief from citation issued by city arising out of a change in zoning, was subject to the four-year catch-all statute of limitations governing actions other than for recovery of real property);
 
 Royal World Metro., Inc. v. City of Miami Beach,
 
 863 So.2d 320, 322 (Fla. 3d DCA 2003) (Act does not bar a private property rights claim against a government agency pursuant to the Act, but does preserve the sovereign immunity that governmental enti- . ties otherwise enjoy);
 
 Sosa v. City of W. Palm Beach,
 
 762 So.2d 981, 982 (Fla. 4th DCA 2000) (dismissal of claimant’s complaint affirmed because claimant failed to comply with prerequisites of Act).
 

 [5]
 

 . The Fourth District has held that possession even of a building permit does not necessarily create a vested property right.
 
 See City of Boynton Beach v. Carroll,
 
 272 So.2d 171, 173 (Fla. 4th DCA 1973) (“It follows then, and it has been so held, that if the possession of a building permit does not create a vested right, then a mere application for a building permit cannot create a vested right.” (citing
 
 Los Angeles
 
 v.
 
 Superior Court,
 
 34 Cal.Rptr. 161 (1963))).
 
 See also Walker v. Indian River County,
 
 319 So.2d 596, 599-600 (Fla. 4th DCA 1975) (securing of site plan approval— whether preliminary or final- — does not create a vested right in the absence of substantial expenditures in reliance).
 

 [6]
 

 . The burden is on the party asserting estop-pel to prove facts giving rise to estoppel.
 
 See Jarrard v. Assocs. Discount Corp.,
 
 99 So.2d 272, 277 (Fla.1957) (“The burden of proving all the facts essential to the working of an estoppel rests on the party asserting it or on whose behalf it is applied.” (citing
 
 First Nat'l Bank of Arcadia v. Savarese,
 
 101 Fla. 480, 134 So. 501 (1931)));
 
 Flanigan’s Enters., Inc. v. Barnett Bank of Naples,
 
 614 So.2d 1198, 1200 (Fla. 5th DCA 1993) ("It is well established that when estoppel is raised as a defense, the burden of proof is on the party asserting it.” (citing
 
 Ennis v. Warm Mineral Springs, Inc.,
 
 203 So.2d 514 (Fla. 2d DCA 1967)));
 
 State v. Hadden,
 
 370 So.2d 849, 852 (Fla. 3d DCA 1979) ("The burden of proving an estoppel rests on the party invoking it, and every fact essential to estoppel must be proved.” (citing
 
 Erwin v. Dekle,
 
 60 Fla. 56, 53 So. 441 (1910)));
 
 Ennis v. Warm Mineral Springs, Inc.,
 
 203 So.2d 514, 519 (Fla. 2d DCA 1967) ("The burden of proving estoppel rests upon the party invoking it.” (citing
 
 Connelly v. Special Rd. & Bridge Dist. No. 5, 99
 
 Fla. 456, 126 So. 794 (1930))).
 

 Mr. Coffield’s testimony did not result in factual findings as to when land-clearing or engineering services were actually contracted or performed. Although Mr. Coffield specified dates on which he received proposals, he did not specify the date(s) he accepted them (or made counterproposals if that is what led to these contractual obligations). These expenses were incurred in order to secure site plan approval, not in reliance on any site plan approval or any other action by the City.
 

 [7]
 

 . Mr. Coffield testified:
 

 I never thought the City would close the roadway, number one. I had made some inquires into it, and discovered that there was not going to be much of an opportunity for the City to close it anyway because there was some problems with closing.
 

 [[Image here]]
 

 Well, first of all, I never thought they would close it. I did some quick research, and it was my understanding from the Planning Department that there were some significant problems with — with closing the roadway because it would, in fact—
 

 [[Image here]]
 

 Yeah. The abandonment of the roadway— and I — I did a whole bunch of investigation on it. But the abandonment of the roadway, the — I looked up some laws and — and case law too on top of it that, but the bottom line is I looked up some law that told me that the existing homeowners' association was less than 15 members, therefore, they couldn't adjust — they couldn't change their bylaws, so they were going to be required, according to their bylaws— only thing they could do was maintain their drainage facilities, which did not allow them the opportunity to maintain any of the
 
 *597
 
 asphalt or any of the accruements. So I — I saw them as — as not being able to be — get the road closed, number one. But then secondarily, if it was closed, I get half the road, so 1 would still have access. And I — I went along under that assumption for the longest period of time until basically I got the letter [from the City on September 26, 2006].
 

 [8]
 

 8. "When a project is proposed, the planning staff of the local government will first determine the impacts of the development and then evaluate whether the capacity exists to accommodate those impacts. If adequate capacity exists, the application can be approved and a concurrency certificate issued." Ruth L. Steiner,
 
 Florida's Transportation Concurrency: Are the Current Tools Adequate to Meet the Need for Coordinated Land Use and Transportation Planning?,
 
 12 U. Fla. J.L. & Pub. Pol’y 269, 278 (2001) (explaining transportation concurrency requirements).
 

 "Florida is purported to be the nation’s leader in developing and implementing concurrency, which is the requirement that every comprehensive plan include the availability of adequate public facilities when a development order is issued, and that the requirement be enforced at the development order stage. The purpose of tire requirement is to ensure that public infrastructure is available at the time of occupancy and as such, timelines for development can be modulated to meet population growth.” J. Celeste Sakowicz,
 
 Urban Sprawl: Florida’s and Maryland’s Approaches,
 
 19 J. Land Use & Envtl. L. 377, 402 (2004) (footnotes omitted).
 

 "The [Growth Management] Act’s concurrency provisions require that every plan include 1) a requirement that adequate public facilities be available when a development order is issued and 2) that this requirement be enforced at the development order stage.” Richard Grosso,
 
 Florida’s Growth Management Act: How Far
 
 We
 
 Have Come, and How Far We Have Yet to Go,
 
 20 Nova L. Rev. 589, 598 (1996) (footnote omitted).