MAKAR, J.,
dissenting.
NIMBY[3] meets the Bert J. Harris Jr. Private Property Rights Protection Act in this case, one in which the value of the property rights of R. Lee and Christy Smith in their riverfront lot has been diminished by the City of Jacksonville’s construction of a one-of-a-kind large-scale marine fire station and multi-bay dock on the neighboring lot, whose deed restriction for park-only use and residential zoning were changed without the Smiths’ knowledge. The legal issue presented is whether the Act provides a claim for the Smiths to show that their lot has been “inordinately burdened” by the government’s action thereby entitling them to a jury trial to assess their losses.
I.
The Smiths, who reside in one of Jacksonville’s Southside neighborhoods, decided in May 2005 to purchase an unimproved riverfront lot located many miles upriver on Hecksher Drive, a shoreline-hugging two-lane road that winds its way along the north bank of the St. Johns River towards its mouth at the Atlantic Ocean. Their plan was to improve the property by adding a deep water dock, and to market it as suitable for a luxurious residence with panoramic southerly views of the river and the quaint fishing village of Mayport with its historic ferry.
Their vision for the residential lot was consistent with uses on the two neighboring lots. The easterly lot had a luxury home with dock and landscaping; the westerly lot was zoned residential and had been restricted by deed — for fifty years— to be “used solely and only for the recreation and enjoyment of such employees of Duval County as the County Commission [now City Council] shall from time to time designate.”
Unbeknownst to the Smiths, the City took action to remove the deed restriction in October 2005. Yet again without the Smiths’ knowledge, in March 2007, the City rezoned the property from Residential Low Density-B to Public Building Facility-]., the purpose of which was to permit the construction of the marine fire station adjoining the Smiths’ property line. The City — which initially said the Smiths had “unclean hands” for not participating in the public rezoning process — ultimately stipulated that it “did not send or serve [the Smiths] with a Notice of Meeting(s) or Notice of Proposed Change of Zoning Ordinance before the zoning ordinance was changed.” As a result, the Smiths were kept in the dark and deprived of the opportunity to speak out on the matter.[4]
After obtaining a building permit in December 2010, the City began construction of Fire Station #40, which was to be Duval County’s[5] third marine facility. It was “first of its kind” within the City— according to Jacksonville Fire & Rescue *898 Department’s facilities officer — because it would also house the land-based structural fire/rescue facility that previously had been landward a block away.[6] Rather than primarily serving the immediate area, as the nearby existing station had, the new marine facility was critical to service the security and safety of a far larger area of the community: the vitally important ocean entryway of the St. Johns River leading to the region’s substantial port facilities, cruise ship terminal, military bases, and, of course, the ferry.
After the City began construction, the Smiths learned of the project. Unhappy with the situation, the Smiths first pursued administrative remedies under the Act[7] by filing a claim with the City and tendering a detailed appraisal, which showed a $470,000 loss in value measured by the difference between its estimated “unimpaired” ($600,000) and “impaired” value ($180,000).
No resolution with the City having resulted,[8] on July 20, 2012, the Smiths filed a single-count complaint seeking relief under the Act. They alleged that the existing use of their lot was residential: they were marketing it for future use as “a luxury residence with adjacent deep water dock-age” for which they had expended “a considerable sum permitting and constructing” on the property. They also alleged the City’s actions in creating “Fire Station #40 with its massive size and planned launch facility and industrial-height fences” had inordinately burdened their “premium, residential waterfront lot” causing a “substantial devaluation” of the property’s value. They asked the trial judge to rule that the City’s actions “inordinately burdened an existing use” of their property or, alternatively, a “vested right to a specific use of real property.” They also sought a jury trial on damages.
The City moved to dismiss the complaint, arguing that the Act did not apply because it had taken “no action ... against” the Smiths’ riverfront lot: the Smiths could still build a residence on the site; no City action was “as applied” to the property; and because the Smiths only argued a loss of value, without a loss of use, they failed to state a cause of action.
The Smiths countered with a lengthy and detailed legal memorandum, the gist of which was that the City’s collective actions inordinately burdened their property, “leaving the Smiths’ land next door to stare at an industrial eyesore sending the investment in premium residential land down the drain.” Their harm was neither facial nor theoretical; instead, the City’s actions directly affected their lot and.its value. Because their complaint raised substantial factual matters, it should not be dismissed; instead, the resolution of whether an inordinate burden was shown is “placed in the hands of the circuit judge.”
The trial judge found that the complaint contained sufficient allegations to state a cause of action under the Act. The City thereafter filed its answer, discovery en *899 sued, and a trial date set. In the interim, the City moved for summary judgment, which a successor judge denied.
After a two-day trial, the trial court issued a “Final Order on Phase I of Trial,” which included the following (now undisputed) findings of fact:
On or about May 20, 2005, the Smiths purchased a parcel of riverfront property in Jacksonville, Duval County, Florida (“the property”). They paid $575,000 for that property, intending it as an investment for re-sale to residential buyers. The property was zoned “Residential Low Density,” as were the properties on either side of it. The property was undeveloped, as was the lot immediately southwest of it. On the next lot to the southwest there stood a home, also on the river, now worth approximately $1.5 million. The parcel immediately to the northeast of the property was owned by the City of Jacksonville. In addition to having the same RLD zoning, there was a deed restriction upon that lot which limited its use to the leisure and recreation of Duval County employees.
On or about October 5, 2005, the City then obtained a cancellation of the foregoing deed restrictions on its parcel. Thereafter, it sought to rezone its parcel for the purpose of building a fire station thereupon. Significantly, in an apparent violation of its own code, the City never sent written notice of its proposed zon-* ing change to the Smiths. Because of that, the Smiths were never able to participate in the rezoning process by asserting the detrimental effect the same would have on their property. In fact, the Smiths never became aware that the rezoning had occurred (in March, 2007), until the construction of the fire station began thereafter.
The fire station, now in existence, is used to respond to general fire and rescue emergencies, as well as marine distress calls. It utilizes a commercial-level dock, which is used not only by two fire boats, but also port security and/or Florida Marine Patrol boats. The fire station property is now separated by the Smiths’ property by an eight-foot chain-link fence, which is immediately adjacent to the fire station’s parking lot. The dock, fence, and fire station height exceed the limits allowed by residential zoning. The fire station also has a balcony overlooking the- Smiths’ property upon which fire fighters congregate. The parking lot is lighted throughout the night. There is a large generator placed near the Smiths’ property, and the building has speakers facing the property from which announcements are made. Claxons are also sounded when an emergency call is received at the fire station, and emergency vehicles may use sirens when departing from it. In short, the City has essentially created a light industrial use for its parcel, without notice to the Smiths. Such a use is in contravention of the City’s own Comprehensive Land Use Plan.
The City attempts to minimize the effect that the fire station has on the Smiths’ property by asserting that the Smiths may still use their property for the construction of a home; that they still have a riverfront view and use of the river; and that the noise emanating from the fire station is no worse than that of other, ambient noise in the area. The ambient noise includes that coming from helicopters which intermittently fly over the area from a nearby naval station. Despite the foregoing, there is no question that the fire station has negatively affected the value of the Smiths’ property. According to the Plaintiffs’ evidence, the diminution may be as much as 80 percent. Even the Defendant’s appraisal expert acknowledged *900 opinions about the negative affect of the fire station on the desirability of the Smiths’ property due to the perception of “all the things you think of when you hear about a fire station next door.” This defense expert opined that the property had been diminished in value by 15 to 20 percent because of its proximity to the station.
An engineering footprint of Fire Station # 40, an aerial photo of the project during its construction, and a street-level photo are in the appendix.
Next, the trial court addressed whether the Act applied to the facts presented, concluding that a cause of action existed because the City’s actions “directly affected” the Smiths’ property. It noted that actions having only an indirect effect are not actionable, citing Attorney General Opinion 95-78. In a potentially problematic statement, the trial court concluded that the “Act provides legislative relief to owners of property when their property has been incidentally diminished in value due to governmental action taken against an adjacent property.” (Emphasis added).[9] It appears likely the word “inordinately” should have been used, because the next sentence says the ultimate question was whether the City “inordinately burdened” the Smiths’ property by its actions culminating in the fire station’s construction. In ruling for the Smiths, the trial court concluded:
There is no question here that the Smiths had a vested right to build a home on the property, or to sell the property to someone who wished to build a residence thereon. There is also no question that, after the construction of the fire station, the Smiths have been left with an inordinate burden placed on the property as to its viability for such use. In fact, the Court concludes that if the Act did not apply to the facts at bar, it would be hard to imagine facts under which it did apply. ’
The trial court then ordered that a jury be empaneled in the next phase to determine the amount of compensation the Smiths were due, which has been held in abeyance in light of the City’s appeal of the non-final order on liability.
II.
A. The Issues Presented
The City makes two discrete arguments on appeal: (1) the Act does not apply in this situation because the City’s actions were “not directly applied” to the Smiths’ property and amounted to only an “indirect or incidental” burden; and (2) even if the Act applies, the City’s actions did not inordinately burden the use of the Smiths’ riverfront lot because it was a “speculative” use. Cut to its core, the City’s claim is that “the Act only applies when damage is caused to the property that is the subject of government action.” The City does not contest any of the factual findings of the trial court, only its legal conclusions. The Smiths counter, saying the Act applies because the effect of the City’s actions directly and inordinately burdened their 'existing, and planned future, residential use. They .agree that landowners have no claim under the Act simply because a government act, such as a general zoning law, theoretically poses a threat. But when the threat becomes a reality via government actions that have direct application and *901 effect on private property, the Act applies and provides a remedy. Thus, when the City acquired permits to build the marine fire station on the adjoining property, rezoned without notice to them, their “as applied” claim was “ripe” for adjudication. To fully consider the competing claims, the legal structure of the protection of private property in Florida is discussed next.
B. Property Rights in Florida
Private property rights, which undergird the system of individual freedoms in Florida, are protected under our state constitution, which says that all natural persons have “inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be rewarded for industry, and to acquire, possess and protect property_” Art. I, § 2, Fla. Const, (emphasis added). These rights are shielded from governmental actions that amount to a “taking” of the title to or full value of the property. Art. X, § 6(a), Fla. Const. (“No private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner.”) (emphasis added). Many other protections exists under Florida law to ensure that property rights are respected and protected; as one example, a twelve-person jury is required whenever the government takes property by eminent domain,[10] a requirement that exists in only one other situation: when the government seeks to take someone’s life.[11]
Despite the constitutional protections that Florida law affords to owners of private property, a persistent tension exists about the extent to which compensation, if any, should be paid for governmental actions that negatively impact private property rights short of a taking. The public good requires firehouses, sewage treatment facilities, and electric transmission lines, the overall benefits of such infrastructure outweighing their collective costs. But what about those cases where the station, plant, or tower imposes severe or disproportionate economic burdens on specific property rights for the public good?
Under takings law, the answer is relatively clear: no compensation is allowed absent proof of a total taking/deprivation of a property right. A bifurcated approach exists whereby compensation is: (a) always required, such as where the government physically appropriates property (categorical approach); versus (b) may be required for actions other than physical appropriations where the exercise of “some police power regulations have such a serious impact on property rights that they must be regarded as a taking” giving rise to the “regulatory takings doctrine.” See David A. Dana & Thomas W. Merrill, Property: Takings 87 (2002) (hereinafter “Takings ”) (citing Pa. Coal Co. v. Mahon, 260 U.S. 898, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (“The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking.”)). The latter approach, termed “ad hoc review,” is “explicitly open-ended, entailing a case-by-case balancing of rather poorly defined factors.” Takings, supra at 88; see also Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015, 112 S.Ct. *902 2886, 120 L.Ed.2d 798 (1992) (“our decision in Mahon offered little insight into when, and under what circumstances, a given regulation would be seen as going ‘too far’ for purposes of the Fifth Amendment. In 70-odd years of succeeding ‘regulatory takings’ jurisprudence, we have generally eschewed any ‘set formula’ for determining how far is too far, preferring to ‘engag[e] in ... essentially ad hoc, factual inquiries.’ ”).
Under the ad hoc approach, an exercise of police powers that “goes too far” can be a regulatory taking based on a consideration of six factors from Pennsylvania Coal and related Supreme Court cases: (1) “the extent of the diminution in the value of the 'property caused by the regulation (2) “whether the regulation upsets reasonable investment-backed expectations”; (3) “the character of the governmental action”; (4) “whether the regulation is of a noxious use of property”; (5) “whether the regulation provides an average reciprocity of advantage among property owners”; and (6) “whether the regulation destroys a recognized property right.” Takings, supra at 132 (emphasis added).
For purposes of this case, the diminution of value factor is highly pertinent because it relates to what degree of economic hardship is constitutionally unacceptable, an oft-asked question.
Perhaps the most commonly asked question in regulatory takings law is: How much diminution of value is enough to qualify as a taking? We know from Lucas [v. S. Carolina Coastal Council, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) ] that if the regulation causes a 100 percent diminution in value, it is a taking per se (at least if the common law nuisance exception does not apply). Short of 100 percent loss in value, however, the degree of diminution is just one factor to be considered under the ad hoc approach. Presumably, the closer the diminution gets to 100 percent, the stronger this factor points toward the conclusion that the regulation is a taking. However, neither the Supreme Court nor the lower courts have developed any clear benchmarks as to what percentage diminution gives rise to a presumption in favor of finding that there has been a taking.
Takings, supra at 135. Unlike those extreme situations “where regulation denies all economically beneficial or productive use of land,” see Lucas, 505 U.S. at 1015, 112 S.Ct. 2886, compensation under the Takings Clause is unavailable for govern-mentally-imposed actions that imposes substantial burdens on property. A regulatory regime, for example, could take ninety percent of the value of a property, yet not amount to a compensable “taking” under state or federal constitutions. See id. at 1020 n. 8, 112 S.Ct. 2886 (“Takings law is full of these ‘all-or-nothing’ situations.”). Instead, the private property owner suffers the entire loss of property value without remedy.
C. The Bert J. Harris Private Property Rights Protection Act
Enter Bert J. Harris Jr., a revered Florida rancher, farmer, and legislator.[12] Rep. Harris and other Florida legislators decided to partially fill the wide gap between the existing constitutional remedy of full compensation for total takings and the absence of any other meaningful remedy for governmental actions that placed inordi *903 nate burdens on private property.[13] No cause of action, constitutional or statutory, had previously existed to provide a remedy in these situations.[14] This was new territory.
To address the chasm, the Florida Legislature in 1995[15] created a unique statutory cause of action in section 70.001, Florida Statutes, aptly named for Rep. Harris, which gave property owners a remedial claim where “specific action of a government entity” caused an inordinate burden. The purpose of the Act need not be gleaned from legislative staff reports or committee tapes; instead, the Legislature made its intent clear by placing it directly in the opening section of the Act:
The Legislature recognizes that some laws, regulations, and ordinances of the state and political entities in the state, as applied, may inordinately burden, restrict, or limit private property rights without amounting to a taking under the State Constitution or the United States Constitution. The Legislature determines that there is an important state interest in protecting the interests of private property owners from such inordinate burdens. Therefore, it is the intent of the Legislature that, as a separate and distinct cause of action from the law of takings, the Legislature herein provides for relief, or payment of compensation, when a new law, rule, regulation, or ordinance of the state or a political entity in the state, as applied, unfairly affects real property.
§ 70.001(1), Fla. Stat. (emphasis added). As highlighted, the clearly expressed legislative intent was to create a “separate and distinct cause of action” that provides relief or compensation when governmental action, such as a “law, rule, regulation, or ordinance,” in application “unfairly affects private property.”
In creating this new cause of action, the Legislature made clear that property owners did not have to show that a taking had occurred to obtain relief. Instead, it determined that “there is an important state interest in protecting the interests of private property owners from such inordinate burdens” arising from governmental actions that fall short of a taking. Id. § 70.001(1); see also id. § (9) (“This section provides a cause of action for governmental actions that may not rise to the level of a taking under the State Constitution or the United States Constitution.”). Claims made under the Act were specifically deemed cumulative to all other remedies including takings claims. Id. (“The provisions of this section are cumulative, and do not abrogate any other remedy lawfully available, including any remedy *904 lawfully available for governmental actions that rise to the level of a taking.”). Double recovery, however, was precluded. Id. (“[A] governmental entity shall not be liable for compensation for an action of a governmental entity applicable to, or for the loss in value to, a subject real property more than once.”).
Buttressing the point that Bert Harris Act claims are distinct and independent, and predominantly unhinged from takings law, the Legislature said “[t]his section may not necessarily be construed under the case law regarding takings if the governmental action does not rise to the level of a taking.” § 70.001(9), Fla. Stat. In other words, newly-minted claims under the Act are not only novel and potentially far-reaching, but courts need not construe them within the confínes of takings law itself; that one cannot point to a case under pre-existing law is irrelevant. A new chapter in the protection of property rights was born.
The first thing the Act defines is the cause of action, contained in section 70.001(2), which states:
(2) When a specific action of a governmental entity has inordinately burdened an existing use of real property or a vested right to a specific use of real property, the property owner of that real property is entitled to relief, which may include compensation for the actual loss to the fair market value of the real property caused by the action of government, as provided in this section.
Id. § 70.001(2) (emphasis added). As the italicized language reflects, and consistent with its legislative history, the Act creates a two-step framework for liability to attach: a “specific action of a governmental entity” that “inordinately burdens” an existing use or vested right in real property creates an “entitle[ment] to relief.” The legislative formula is “Specific Governmental Action” + “Inordinate Burden” = Relief. This is not to be confused with the two phases of a Bert Harris claims: Phase I, where liability for an inordinate burden is established by the trial court (at issue here);[16] and Phase II, where a jury determines the property owner’s loss.[17]
D. “Specific Action of Governmental Entity ”
Turning to the first part of the liability formula, the Act defines “action of a governmental entity” to mean “a specific action of a governmental entity which affects real property, including action on an application or permit.” Id. § 70.001(3)(d) (emphasis added).
Taking the latter highlighted portion first, “affects” is a potentially broad concept, whose natural understanding is “to influence; to have an effect on.” Bryan A. Garner, A Dictionary of Modem Legal Usage 34 (1995). The Act provides no limiting definition, so “affects” would include both positive/negative and direct/indirect effects. For that reason, little disagreement exists that the City’s actions— whether actionable or not — “affected” the Smiths’ property. Indeed, the City’s-own expert opined that a substantial loss in *905 value (over $40,000) resulted after issuance of the building permit for the marine fire station. And the City does not argue to the contrary.
As to what “specific actions” fall within the Act’s scope, it first bears noting that the Act provides no definition of this phrase, one that again is potentially broad. At various points and for various purposes, the Act refers to various combinations of governmental actions such as “laws, regulations, and ordinances,”[18] a “new law, rule, regulation, or ordinance,”[19] a “law or regulation,”[20] and a “rule, regulation or ordinance,”[21] but no unified list is evident. While one might conclude that laws, regulations, ordinances, rules and other similar actions are within the ambit of “specific actions,” nothing in the language or structure of the Act precludes any other “specific actions” that might impose an inordinate burden on private property in their application, such as a permitting action— which is specifically included in the definition of “specific action.”[22] What can be concluded is that the breadth of what “specific actions” covers is substantial.
Here, the Smiths point to governmental actions in the form of removal of the deed restrictions, rezoning of the adjoining property, issuance of permits, and other governmental compliance activities needed to transform the lot from its restricted use as a park for city employees to one zoned for use as a marine fire facility, fully permitted for construction and in compliance with environmental laws (including the use of state submerged sovereignty lands). Notably, the statutory language says that “specific action” includes an “action on an application or permit ” thereby making the Smiths’ permitting claim fit easily within the Act’s purview. Indeed, the City concedes that the issuance of the building permit and, as argued by the Smiths, the rezoning of the property may be considered “specific actions” under the Act. The City does not argue the rezoning is irrelevant or time-barred; instead, it argues only that the rezoning was of its own property — not the Smiths’ — leaving the al *906 lowable uses of the Smiths’ lot unchanged. The City’s argument is that the “specific action” must also be done with the intent to apply it directly to the subject real property, here the Smiths’ lot, which is the topic to which we next turn.
E. The Meanings of “Inordinate Burden” and “As Applied ”
The City’s principal argument is that the “specific actions” at issue are not covered by the Act because they were not intended to be specifically directed at or applied to the Smiths’ property. This argument arises from the City’s interpretation of what constitutes an “inordinate burden” as statutorily defined, as well as the use of the phrase “as applied” elsewhere in the Act. As will be seen, neither interpretation is supportable under the Act as a whole.
Before doing so, it bears emphasis at the outset that if the Florida Legislature had intended to enact a more narrow meaning of governmental action, one consistent with the City’s position, they could have easily done so. For example, Texas, which adopted its own Bert Harris-type of claim in 1995, defined its new cause of action with the following limitation on governmental action:
(B) a governmental action that:
(i) affects an owner’s private real property that is the subject of the governmental action, in whole or in part or temporarily or permanently, in a manner that restricts or limits the owner’s right to the property that would otherwise exist in the absence of the governmental action; and
(ii) is the producing cause of a reduction of at least 25 percent in the market value of the affected private real property, determined by comparing the market value of the property as if the governmental action is not in effect and the market value of the property determined as if the governmental action is in effect.
§ 2007.002(5), Tex. Gov’t Code Ann. (West 2008) (emphasis added). The highlighted phrase makes clear under Texas law that the private property at issue must have been “the subject of the governmental action.” No such limitation exists under the Act, which could be easily re-written to do so. How difficult would it have been to define “action of a governmental entity” to mean a “specific action of a governmental entity which affects real-property,- an owner’s private real property that is the subject of the governmental action ”? But the Legislature has not done so, instead enacting — and retaining over the past two decades — a broader view of the Act’s scope. The Act would have to be judicially revised, essentially interlineating the language from the Texas statute, to impose the limitation the City advocates.[23]
*907 With this thought in mind, we turn to the definition of “inordinate burden/inordinately burdened,” which has two distinct meanings, the first paralleling a traditional takings claim with an emphasis on “investment-backed” expectations and the like, the second focusing on whether an “unfair burden” is borne “for the good of the public.” It is only the second meaning, the “unfair burden” claim, upon which the trial judge ruled, that is at issue.[24]
The two statutory meanings, which are separated by the bolded word “or” midway in the following paragraph, have two alternative constructions: one that includes the italicized language only in the first meaning (bracketed by [1] and [2]), and one that applies the italicized language to both meanings (parenthetically (1) and (2)):
(e) The terms “inordinate burden” and “inordinately burdened”:
1. Mean [1] that an action of one or more governmental entities has directly restricted or limited the use of real property such (1) that the property owner is permanently unable to attain the reasonable, investment-backed expectation for the existing use of the real property or a vested right to a specific use of the real property with respect to the real property as a whole, or [ (2) ] that the property owner is left with existing or vested uses that are unreasonable such that the property owner bears permanently a disproportionate share of a burden imposed for the good of the public, which in fairness should be borne by the public at large.
§ 70.001(3)(e), Fla. Stat. (emphasis, bold, parentheses, and brackets added). The first question is how to construe this ambiguity.
The more natural, and linguistically accurate, construction is the bracketed approach.[25] The reason is that the conjoined phrase “such that” is kept intact rather *908 than split in an awkward way; this construction also preserves the word “that ” (the third in the sentence), which would otherwise be surplusage (“such that ... that the property .... ”). See Scalia & Garner, Reading Law: The Interpretation of Legal Texts 174 (2012) (discussing “Sur-plusage Canon,” which “holds that it is no more the court’s function to revise by subtraction than by addition.”).
Under this construction, the second meaning — the one upon which the Smiths’ claim is based — is read as follows: the “terms ‘inordinate burden’ and ‘inordinately burdened’ ... Mean ... that the property owner is left with existing or vested uses that are unreasonable such that the property owner bears permanently a disproportionate share of a burden imposed for the good of the public, which in fairness should be borne by the public at large.” That is how the trial judge ultimately interpreted this section, because his holding on pages 5-6 of the order concludes that the City’s actions have inordinately burdened the Smiths’ property in precisely this way. This makes sense in light of the Legislature’s stated intent that compensation be available when governmental action in application “unfairly affects real property.” See § 70.001(1), Fla. Stat.
This construction, of course, avoids any need to address the first prong and the meaning of the phrase “directly restricted or limited” and its application to the Smiths’ lot. But even if the phrase applies to both prongs, it is a stretch to interpret it as requiring that the owner’s private property to have been the specific subject of the government’s action. A revision, much like the language of the Texas statute, would be necessary to achieve this result. For example, a revision might say “that an action of one or more governmental entities has directly restricted or limited the use of the owner’s real property that is the subject of the governmental action such that .... ” Because no such limitation exists in the statutory language, this Court should not judicially insert it.
The more intuitive and reasonable way to read the phrase “directly restricted or limited the use of real property” is to focus upon whether the governmental restriction or limitation is direct rather than indirect. Directness can arise in a number of ways. One, which the City advocates, is where the governmental action was specifically directed at and intended to affect the owner’s real property, i.e., it was directly and purposefully the subject of the City’s action. Under this view, the City’s actions— no matter how much they devalue an immediately adjacent owner’s property — are not actionable under the Act; even a total devaluation is non-actionable, recourse being limited to a pre-existing categorical taking claim under the constitution.
Another approach is to consider whether governmental action is direct, uninterrupted, and immediate, as in this case, such that the effects of the marine fire station are borne directly by those close-by who share a property line. This approach makes the most sense, and need not open vistas of ruinous liability.[26] The conclusion *909 that an adjoining property is directly affected under the Act draws a relatively clear line. Directness in this sense has a commonly understood meaning. Florida shares a direct border with Georgia; its spatial relationship to Tennessee is indirect; and Alaska is remote. The point is that proximity to property differs from contiguity with a property’s boundary; the latter is palpable and direct, the former uncertain, indirect, and potentially remote.[27] That Bert Harris Act claims would proliferate if allowed to be based on indirect or remote harm is a reasonable concern; but construing “direct” to apply to the residential use of Smiths’ immediately adjacent property to a one-of-a-kind marine fire station under the highly unusual facts presented ameliorates this worry, leaving other possible “direct” applications to be judged on a case-by-case basis within the intent of the Act.[28]
The City also contends that the phrases “as applied” or “as applied challenge”— which each appears twice in the Act— supports the notion that the Smiths’ property must be the subject of the governmental action. First and foremost, the use of the phrase “as applied” is most reasonably understood as creating a differentiation from mere facial applications of the Act, such as when a law is passed but not immediately applied. As this Court has held, facial claims directed to the mere enactment of a law, for example, are not permissible until the law is applied to the property in question. Thus, jurisdiction-wide enactments of general applicability cannot be challenged; to do so would constitute a “facial” challenge, which the Act prohibits. M & H Profit, Inc. v. City of Panama City, 28 So.3d 71, 77 (Fla. 1st DCA 2009) (“[Tjrial court properly held the mere enactment of a general police power ordinance or regulation does not give rise to a Bert Harris Act claim.”). Until a government action is actually applied in a specific situation, the Act is dormant and merely inchoate. Contrarily, when an enactment is first applied to a property, it constitutes governmental action that may be subject to the Act in an “as applied” context. M & H Profit, 28 So.3d at 76 (“Simply put, until an actual development plan is submitted, a court cannot determine whether the government *910 action has ‘inordinately burdened’ property”). Neither the text of the Act, nor any case construing it, supports the notion that only those governmental actions that explicitly say they apply to an identified and specific piece of property are actionable.
Of note, twenty years ago, Attorney General Bob Butterworth was presented with the abstract question of whether the Act provided “a means for the recovery of damages to property other than the property that is the subject of governmental action or regulation, but that may have suffered a diminution in value or other loss as a result of its proximity to the property that is subject to the regulation?” Op. Att’y Gen. Fla. 95-78 (1995). No specific facts were provided, and no court had yet issued any opinions under the Act. In response, he opined that the “plain language of the statute indicates that only real property that is directly affected by a governmental regulation is covered by the provisions of the act.” As such, “it does not appear that the Legislature contemplated extending the compensation provisions of the act to real property that may be incidentally affected by a governmental action or regulation directed at a separate, specific parcel of real property.” (Emphasis added). Of course, the Smiths’ property was directly and more than “incidentally” affected, which would place it outside of the parameters of the opinion. But the Attorney General, wrongly, seemed to en-graft onto the Act the type of Texas-style language discussed above. The opinion, which has persuasive value, would be more so if it addressed in more detail a fact pattern similar to this case and had addressed the Texas statute. Indeed, an amicus brief from the current Attorney General would have been insightful, particularly because her office is the statutory repository of all claims and settlements under the Act, § 70.001(4)(b), (6)(d), Fla. Stat., but amicus briefs have not been allowed.
F. Sovereign Immunity
As a supporting point, the City argues, on appeal for the first time, that the Act should not be interpreted to include the Smiths’ claim because to do so would im-permissibly expand the Act’s intended reach and thereby expose governmental entities to liability for which the Legislature has not waived sovereign immunity. The Act, which is both broad in its application and remedial in nature, however, provides for a clear and unequivocal waiver of sovereign immunity as to the State and all of its political subdivisions.
In accordance with s. 13, Art. X of the State Constitution, the state, for itself and for its agencies or political subdivisions, waives sovereign immunity for causes of action based upon the application of any law, regulation, or ordinance subject to this section, but only to the extent specified in this section.
§ 70.001(13), Fla. Stat. It is clear and unequivocal because the Legislature specifically adopted this language in 2011 to quell judicial uncertainty about the scope of immunity. See Ch. 2011-191, § 1, Laws of Fla.; Royal World Metro., Inc. v. City of Miami Beach, 863 So.2d 320, 322 (Fla. 3d DCA 2003). In assessing the legitimate extent of this otherwise clear and unequivocal waiver, two conflicting canons come into play. One interpretive canon says that grants of sovereign immunity should be strictly construed, which is important to protect against results the Legislature did not intend. Yet another says that remedial statutes are to be construed liberally to effectuate their purpose. How do these apply in the context of this case?
First of all, resort to these canons is unnecessary. As discussed earlier, a construction of the Act that allows the Smiths to pursue their claim does no disservice to *911 the language and intent of the Act; it sets off no cataclysm. Incidental, indirect, or remote effects do not amount to an inordinate burden; only those shown to have direct application are actionable. And in the context of this unusual case, recognizing a cause of action for the inordinate burden imposed by the unprecedented, industrial-like 24/7 marine facility built on a residential border signals that Bert Harris remedies apply to only the most direct and burdensome governmental actions. Because the Smiths’ claim is within the letter and spirit of the Act, no need exists to engage in canon analysis.
Even if done, the application of these canons to the Act leads to the same result. The Legislature has made abundantly clear that the Act is remedial in nature: it has created a potent remedy for private property owners that previously did not exist. Its stated intent was to create “a separate and distinct cause of action from the law of takings” to rectify the unfair effects of governmental actions that apply to and inordinately burden real property.
In circumstances where the legislative enactment is so clearly remedial in nature, the canon of strict construction takes a back seat. This point was highlighted in the Supreme Court’s decision in Iruen v. Department of Health & Rehabilitative Services, 790 So.2d 403, 406 (Fla.2001), in which a former child protective investigator sued her employer, the Department of Health and Rehabilitative Services, under Florida’s Whistle Blower’s Act, claiming she was terminated in reprisal for having raised questions about the appropriateness of a venue transfer in a child dependency case. After a jury verdict in her favor, the Department appealed to the Second District, arguing that the Act did not waive sovereign immunity for the type of claim the investigator asserted.
On appeal, the Second District addressed the “determinative issue” of “whether the acts and communications by [the investigator] were ‘whistle-blower’ acts, as defined and protected by the ‘Whistle-Blower’s Act.’ ” Dep’t of HRS v. Irven, 724 So.2d 698, 699 (Fla. 2d DCA 1999), quashed, 790 So.2d 403 (Fla.2001). In holding that the investigator’s claim “did not constitute behavior protected under the Act,” the Second District relied upon the “strict construction” canon, stating:
it is clear to us that the “Whistle-Blower’s Act,” ... clearly and unequivocally waives sovereign immunity for the purposes of the “Remedies” and “Relief’ afforded by subsections 112.3187(8) and (9). It is equally clear to us, however, that because any waiver of sovereign immunity must be clear and unequivocal ..., the waiver must be limited to the acts or conduct clearly and unequivocally prohibited or protected against. Therefore, the waiver must be strictly construed and applied. A protection against acts not clearly delineated as prohibited or protected must not be implied.
724 So.2d at 699. “Viewing the Act in this narrow light, the [Second District] found that petitioner’s complaints were not protected and that to decide otherwise would turn ‘every disagreement by an agency employee with the handling of a matter subject to judicial supervision and control into a whistle-blower action.’ ” 790 So.2d at 405 (quoting district court).
On review in the supreme court, the central question was again whether the investigator’s acts and communications were actionable such that a waiver of sovereign immunity applied. In analysis that directly applies here, the Florida Supreme Court addressed whether the “Whistle Blower’s Act should be strictly or liberally *912 construed,” holding that the Act’s remedial nature trumped the canon of strict construction. In reversing, the supreme court held that the Second District’s “strict construction is incompatible with the broad language in the Act which establishes a wide scope of activity that may give rise to its protections.” Id. It concluded that the Department’s “argument that the Act should be strictly construed because it is in derogation of the common law is unavailing: ‘When a statute is both in derogation of the common law and remedial in nature, the rule of strict construction should not be applied so as to frustrate the legislative intent.’ ” 79Ó So.2d at 406 (noting a liberal construction applies to a “new and independent cause, unknown to the common law”) (citation omitted).
The supreme court also addressed how to resolve situations where statutory language creates doubt or ambiguity about whether a cause of action was intended, stating:
If the plain meaning of [the statute’s remedial] section leaves any doubt as to the inclusiveness of this right of action and the broad protections afforded, the Legislature also provided [in the Whistle Blower’s Act] that “it is ‘the intent of the Legislature to prevent agencies ... from taking retaliatory action against any person who discloses information to an appropriate agency alleging improper use of governmental office ... or any other abuse ... on the part of an agency, public officer, or employee.’ ” § 112.3187(2), Fla. Stat. (1998). The statute could not have been more broadly worded.
790 So.2d 408 at 406 (emphasis added); see also Martin Cnty. v. Edenfield, 609 So.2d 27, 29 (Fla.1992) (‘Whistle-Blower’s Act is a remedial statute designed to encourage the elimination of public corruption by protecting public employees who ‘blow the whistle.’ As a remedial act, the statute should be construed liberally in favor of granting access to the remedy.”) (citation omitted).
Liberal construction of a remedial statute, and legislative intent, ruled the day in Irven, which has obvious parallels to this case. Like the "Whistle Blower’s Act, the Bert Harris Act is quintessentially remedial: its raison d’etre is the creation of a new and innovative remedy to protect private property rights from inordinate burdens. In deciding whether a claim falls within the Act’s scope, and is thereby actionable against the government and payable from its treasury, the lesson of Irven and related cases from our supreme court is clear: “The statute should be construed liberally in order to give effect to the legislation.” Id. at 406. Moreover, any doubt as to whether the Smiths’ claim is actionable under the Act is resolved by resort to its stated legislative history, which recognizes “an important state interest in protecting the interests of private property owners from such inordinate burdens” arising from the application of a governmental act that “unfairly affects real property.”
G. “Existing Use’’of Property as Speculative
■ In arguing no inordinate burden exists, the City claims the Smiths’ use of their property was “speculative” in the financial sense, thereby placing it outside the statutory definition of the term “existing use” which is:
1. An actual, present use or activity on the real property, including periods of inactivity which are normally associated with, or are incidental to, the nature or type of use; or
2. Activity or such reasonably foreseeable, nonspeculative land uses which are suitable for the subject real property and compatible with adjacent land uses and which have created an existing fair *913 market value in the property greater than the fair market value of the actual, present use or activity on the real property.
§ 70.001(3)(b)(l), (2), Fla. Stat. (emphasis added). The Legislature, in 2011, made this emphasized change, making clear that the statute has two distinct categories of existing uses: current uses and certain future “reasonably foreseeable, nonspecu-lative” uses. See Ch. 2011-191, § 1, Laws of Fla.
First of all, subsection 1 textually supports that the Smiths’ use is an “actual, present use or activity on the real property, including periods of inactivity which are normally associated with, or are incidental to, the nature of type of use.” It is commonplace in Florida that people purchase and hold (and in this case improve) residential lots with the hope to sell at a higher price. This ubiquitous, if not prosaic, type of use fits squarely in subsection 1 as an actual, present use of the Smiths’ property for residential purposes. Even if they sell the lot, it is for a residential use; whether current or future, the use will be the same: residential. No speculation or conjecture is necessary to reach this conclusion.
In contrast, subsection 2 addresses the entirely different situation where a property owner claims entitlement to a future use that is different from the current use. In other words, subsection 2 expands the breadth of “existing use” to include “reasonably foreseeable, nonspeculative land uses” that might be suitable on the property and be compatible with adjacent uses, thereby increasing the market value of the property, creating “an existing fair market value greater than the fair market value of the actual, present use or activity on the real property.” Id. (emphasis added). The point of subsection 2 is not to preclude “speculation” in the financial sense; if that were the case, no privately-held real property would qualify because land ownership always involves an element of financial risk. Instead, subsection 2 is designed to limit possible future land uses to only those that are within reason, i.e., “reasonably foreseeable” and “nonspeculative.” Stated differently, future uses that are merely theoretical or hypothetical do not qualify; they are speculative in the sense of these two terms. For example, if the Smiths had claimed they reasonably anticipated developing or selling their property for use as a riverfront casino, it likely would be deemed a “speculative” land use under subsection 2. No matter; whether under subsection 1 or subsection 2, the Smiths’ present use of their property — and its anticipated future use — is for an actual, nonspeculative purpose: residential.
The City also relies on City of Jacksonville v. Coffield, 18 So.3d 589, 596 (Fla. 1st DCA 2009), claiming the Smiths had no “vested right” to the claimed use of their residential lot. The definition of “inordinate burden,” however, speaks in terms of government action that impacts “existing or vested uses” that become unreasonable due to unfair burdens imposed upon them. § 70.001(3)(e), Fla. Stat. Here, the Smiths prevail simply by having shown an “unfair burden” on an “existing use,” that being for residential purposes. Radio Station WQBA, 731 So.2d at 644.
The trial court characterized the Smiths’ existing right to build a residence as a “vested right to build a home on the property, or to sell the property to someone who wished to build a residence thereon.” The City takes issue, saying no “vested right” exists because the Smiths can still use their lot for residential purposes and they were not misled by any of the City’s acts or omissions to their detriment under principles of equitable estoppel; the City says “[njeither the Smiths nor the trial *914 court could point to any reason why the current circumstances are exceptional, because they are not.” But the factual findings — which the City has not contested— show acts and omissions upon which the Smiths relied to their detriment in buying, improving, and marketing the lot.
Moreover, the situation in Coffield is far afield from the Smiths’ case. The property owner in Coffield claimed a vested right to develop a two acre undeveloped parcel into eight single-family lots at a time when he had not even closed on the purchase of the parcel, later did nothing to improve it, made no financial outlay in support of the proposed development, and, importantly, was on notice that a public roadway, critically necessary to access the eight proposed lots, was in the process of being closed. Because the owner was on notice prior to acting on his emergent development plans, that the public road could be closed, it was apparent that “[d]evelopment of the property into eight single-family lots was never an ‘existing use’ of the property or a ‘vested right.’ ” Id. at 596. And “[o]nee Mr. Coffield learned that an application had been filed to close the only roadway providing ingress and egress to the property, development of the property into eight single-family lots was, if still a possibility, by no means a ‘reasonably foreseeable, nonspeculative,’ use of the property.” Id. (citing § 70.001(3)(b), Fla. Stat. (2006)).
By sharp contrast, the Smiths’ lot was, has been, and continues to be limited to one single and unchanging use: residential. It is not as if the Smiths, like the developer in Coffield, were attempting to pursue some developmental venture that would change the use or character of the property in any way. Moreover, unlike the property owner in Coffield, who knew of the possible road closure, the Smiths were aware of neither the City’s change to the deed restriction nor the zoning change, the latter arising from the City’s failure to notify them. Under these inequitable circumstances, the Smiths clearly established an “existing or vested use” for purposes of showing an “inordinate burden” under the “unfair burden” portion of section 70.001(3)(e).
H. “Public Policy ”
As a final matter, the City argues that allowing the Smiths’ claim to proceed is “contrary to the intent of the Act and contrary to sound public policy.” As to the latter point, the desirability of whether the government should bear the expense of inordinate burdens on private property, such as the Smiths’ lot, can be debated and will continue to be a topic of disagreement. Those inclined to protect the public fisc will agree with the City’s view; those inclined to protect private property rights will agree with the Smiths’.
But as to the City’s former point, stressing the “intent of the Act,” it is noteworthy that the Legislature recognized the protection of private property rights from inordinate burdens as an “important state interest” and created a new cause of action to remedy governmental actions that “unfairly affects” such interests. § 70.001(1), Fla Stat. (emphasis added). Particularly noteworthy is the Legislature’s substantive use of the term “fairness” in section 70.001(3)(e), whose second meaning of “inordinate burden” — the one at issue here— provides relief where a “property owner bears permanently a disproportionate share of a burden imposed for the good of the public, which in fairness should be borne by the public at large.” (Emphasis added). The word “fairness” rarely appears in the statute books,[29] almost invari *915 ably expressing that procedures,[30] insurance rates[31] and evidentiary decisions should reflect fairness,[32] or that fairness is a component of good moral character.[33] In sharp contrast, the Act uses the word in a substantive way to describe the nature of the “unfair burden” an “inordinate burden” may impose, which is bookended by the stated legislative intent that government action not “unfairly” affect people’s property rights. The Legislature’s use of “fairness” as a substantive concept is a charge to the judicial branch that it determine — much like a court of equity — what governmental burdens on property owners are unfair, and to act against the government’s fiscal interest by construing the Act in a way that favors the rights of property owners. As one set of commentators said in 1995, “[pjerhaps most importantly, the [Act] is intended to reform the way government does business with landowners.”[34] The Act is a rare bird — a self-inflicted, anti-majoritarian constraint on governmental action — that informs the manner by which judicial construction of the Act should proceed.
III.
In conclusion, the Bert J. Harris Jr. Private Property Protection Act is a remedial one, designed to compensate inordinate burdens that — in the Legislature’s own words — unfairly affect real property rights in their application. The Act, read as a whole, including its clearly stated legislative intent, supports the limited type of claim the Smiths have asserted on the atypical facts presented. The trial court’s order that the Act applies and that the City’s actions amounted to an inordinate burden on the Smiths’ property should be affirmed.
*916 Appendix
[[Image here]]
*917 [[Image here]]

. “Not in my backyard."

. Mr. Smith, an experienced real estate lawyer, later testified that he "would have mobilized, had I gotten that notice, big time." In his view, "whether it was my land or somebody else's, [it was] probably about the worst proposed zoning ordinance I've seen in the history of practicing law.”

.The Consolidated City of Jacksonville and Duval County (excepting the beach communities and Baldwin) are a single, synonymous entity under the City Charter effective in 1968.

.In contrast to the old fire station that had been serving the neighborhood, which simply looked "like a house” and blended in, the new marine fire station was — in Mr. Smith's view — "just the most offensive thing I've ever seen next to a residential lot. It's a disgusting, depressing site if you own the land next to it.”

. One of the Act’s innovative features is an expedited process by which property owners and governmental entities can attempt to reach a settlement. § 70.001(4), (5), Fla. Stat.

. The City proposed no settlement and merely sent a list of allowable uses, which was the first communication the Smiths had received from the City since the time of the rezoning process in 2007.

. Portions of the trial court's order could be interpreted in ways that suggest its reasoning is faulty, but — as discussed below — it reached the correct result. Dade Cnty. Sch. Bd. v. Radio Station WQBA, 731 So.2d 638, 644 (Fla. 1999) (“Stated another way, if a trial court reaches the right result, but for the wrong reasons, it will be upheld if there is any basis which would support the judgment in the record.").

. § 73.071(10), Fla. Stat. ("[T]he court shall impanel a jury of 12 persons as soon as practical considering the reasonable necessities of the court and of the parties, and giving preference to the trial of eminent domain cases over other civil actions, .... ”).

. § 913.10, Fla. Stat. ("Twelve persons shall constitute a jury to try all capital cases, and six persons shall constitute a jury to try all other criminal cases.”).

. See Florida Agricultural Hall of Fame, Bert J. Harris, Jr., http://floridaaghalloffame.org/ 1999/10/bert-j-harris-jr/ (describing Rep. Harris as a "champion of private property rights in Florida”).

. See, e.g., Brevard Cnty. v. Stack, 932 So.2d 1258, 1261 n. 5 (Fla. 5th DCA 2006) ("The law of regulatory takings is insufficient to provide relief to private property owners unless those owners were either ousted from, or deprived of, all beneficial use of their property. Lee County v. Kiesel, 705 So.2d 1013 (Fla. 2d DCA 1998).”).

. Momentum for the Act in the 1995 Session arose, in part, due to prior legislative efforts to enact such a law and a citizens' initiative on property rights that, although having the requisite signatures for placement on the ballot, was stricken because it was too broad and violated the single subject requirement of the state constitution. Advisory Op. to the Att'y Gen. re Tax Limitation, 644 So.2d 486, 494 (Fla. 1994) (the proposed addition to article I, section 2, was: "Any exercise of the police power, excepting the administration and enforcement of criminal laws, which damages the value of a vested private property right, or any interest therein, shall entitle the owner to full compensation determined by jury trial with a jury of not fewer than six persons and without prior resort to administrative remedies. This amendment shall take effect the day after approval by the voters.”).

.Ch. 95-181, § 1, Laws of Fla. (effective Oct. 1, 1995).

. § 70.001(6)(a), Fla. Stat. ("The circuit court shall determine whether an existing use of the real property or a vested right to a specific use of the real property existed and, if so, whether, considering the settlement offer and statement of allowable uses, the governmental entity or entities have inordinately burdened the real property.”).

. Id. § 70.001(6)(b) ("Following its determination of the percentage of responsibility of each governmental entity, and following the resolution of any interlocutory appeal, the court shall impanel a jury to determine the total amount of compensation to the property owner for the loss in value due to the inordinate burden to the real property.”).

. Id. § 70.001(1) ("The Legislature recognizes that some laws, regulations, and ordinances of the state and political entities in the state, as applied, may inordinately burden, restrict, or limit private property rights without amounting to a taking under the State Constitution or the United States Constitution.") (emphasis added).

. Id. ("Therefore, it is the intent of the Legislature that, as a separate and distinct cause of action from the law of takings, the Legislature herein provides for relief, or payment of compensation, when a new law, rule, regulation, or ordinance of the state or a political entity in the state, as applied, unfairly affects real property.”) (emphasis added).

. Id. § 70.001(3) ("In determining whether reasonable, investment-backed expectations are inordinately burdened, consideration may be given to the factual circumstances leading to the time elapsed between enactment of the law or regulation and its first application to the subject property."); § 70.001(11) ("A cause of action may not be commenced under this section if the claim is presented more than 1 year after a law or regulation is first applied by the governmental entity to the property at issue.”) (emphasis added).

. Id. § 70.001(4)(d)l. ("Whenever a governmental entity enters into a settlement agreement under this section which would have the effect of a modification, variance, or a special exception to the application of a rule, regulation, or ordinance as it wóuld otherwise apply to the subject real property, the relief granted shall protect the public interest served by the regulations at issue and be the appropriate relief necessary to prevent the governmental regulatory effort from inordinately burdening the real property.”) (emphasis added).

. The Act includes as a "specific action” an "action on an application or permit.” § 70.001(3)(d), Fla. Stat. Permits were required for the construction of the facility as well as from the St. Johns Water Management District.

. A triumvirate of commentators, who were involved in the debate over the Act's enactment, rejected that the Act, as written, contained such a limitation, saying in a 1995 article that:
On the other hand, the directness requirement should not be converted into a straitjacket. It should not, for example, be construed to mean that a statute, rule, ordinance, or regulation must specifically set forth in detail the precise restriction on a particular owner's property. Such a construction would be at odds with the legislative intent that the Harris Act address grievances arising from statutes, rules, regulations, or ordinances "as applied” to private land.
David L. Powell, Robert M: Rhodes, & Dan R. Stengle, A Measured Step to Protect Private Property Rights, 23 Fla. St. U. L. Rev. 255, 272-73 (1995) (emphasis added) (hereinafter Measured Step). Cf. Ronald L. Weaver, 1997 Update on the Bert Harris Private Property Protection Act, Fla. B.J., Oct. 1997, at 70 ("To constitute an 'inordinate burden,' an action of one or more governmental entities must be direct and must either: 1. Restrict or limit the owner’s use of the subject property ... or 2. *907 Leave the property owner with "existing” or "vested” uses that are unreasonable such that the property owner bears permanently a disproportionate share of a burden that should be imposed on the public at large.”).

. Reported cases under the Act are scarce, most involving the first statutory meaning of "inordinate burden,” such as City of Jacksonville v. Coffield, 18 So.3d 589, 594-95 (Fla. 1st DCA 2009) ("Few cases interpret the substantive provisions of the Act, or elaborate on the statutory definitions of ‘inordinate burden’ and 'investment-backed expectation.' ”).

. This is the approach the three commentators described in their 1995 article, which discussed the two "tests” of "inordinate burden”:
Under the first test, the effect of the governmental action must satisfy three criteria. First, the governmental action must have directly restricted or limited the use of real property to the extent that the landowner is unable to realize the reasonable, investment-backed expectation of the existing use of the real property or a vested right to a specific use of the real property....
Measured Step, supra at 273 (emphasis added) (footnote omitted). In describing the second test, for the "unfair burden” prong of the statute, they say:
The alternative test for demonstrating an inordinate burden is to show that, by virtue of the regulatory action, the landowner has been left with existing uses or vested rights which are so unreasonable that the landowner permanently bears a disproportionate share of a burden imposed for the good of the public and which, in fairness, should be borne by the public. This test allows the court to take remedial action when governmental action has been unreasonable or has excessively limited the uses on a landowner’s property.
Id. at 274 (footnote omitted). No mention is made about directedness being a part of or a criterion of the test. At most they say in general elsewhere in a footnote that "directly restricted or limited” "is important primarily for delineating the type of governmental action which is subject to a Harris Act claim.” Id. at 314 n. 101.

. The City says it is being held “strictly liable any time there is an impact to another property, regardless of its proximity to the directly affected property, putting [it] in this impossible position.” (Emphasis added). But the Act creates no strict liability, nor does the Act extend limitless liability to impacts on any properly no matter how remotely located. Indeed, the Act has many limitations that preclude liability, such as (I) exhaustion of administrative remedies; (2) statute of limitations; (3) proof of "permanent” imposition of unfair burden; (4) no recovery for temporary impacts, actions to stem public nuisances or noxious uses; and so on. And there is no *909 "guaranty” a jury will award the amount a claimant seeks.

. This approach is that described by the three commentators in 1995:
The governmental action must have "directly restricted or limited the use” of the owner's land. This requirement should be interpreted to mean that an actions effect is “in a direct way without anything intervening; not by secondary, but by direct, means.” A governmental action which indirecdy burdened or inadvertently devalued an owner’s land, because of regulatory decisions regarding another owner’s property, would be too attenuated for relief under the Harris Act.
Measured Step, supra at 272-73 (emphasis added).

. In a similar way, courts for decades have adjudicated claims of "discriminatory, or ‘reverse spot,’ zoning: that is, a land-use decision which arbitrarily singles out a particular parcel for different, less favorable treatment than the neighboring ones.” Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 132, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978). Due to zoning changes, a residential property that directly borders other dissimilar uses, such as commercial, can become a "veritable island” or peninsula entitled to judicial relief under this concept. See generally Terry E. Lewis, Steve Lewis, & David Layman, Spot Zoning, Contract Zoning, And Conditional Zoning, 2 Fla. Envtl. & Land Use L. (1994); see, e.g., Olive v. City of Jacksonville, 328 So.2d 854, 856 (Fla. 1st DCA 1976) ("While imposition of CPO zoning classification upon appellants' property does not render it a ‘veritable island’ ..., it does render the subject property a literal peninsula."). The Smiths' property is not unlike the "literal peninsula” in Olive.

. Approximately forty-four references were found, thirty-four if the ten references to "As *915 bestos and Silica Compensation Fairness Act” are eliminated.

. See, e.g., § 985.01(l)(f), Fla. Stat. (juvenile justice hearing must meet “constitutional standards of fundamental fairness and due process.”).

. See, e.g., § 627.0651(10), Fla. Stat. (insurer or rating organization must provide information that "proves the reasonableness, adequacy, and fairness of the rate or rate change.”).

. See, e.g., § 90.108(1), Fla. Stat. ("When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him or her at that time to introduce any other part or any other writing or recorded statement that in fairness ought to be considered contemporaneously.”).

. See, e.g., § 468.433(a), Fla. Stat. ("Good moral character means a personal history of honesty, fairness, and respect for the rights of others and for the laws of this state and nation.”).

. Measured Step, supra at 258.